242 N.J. Super. 549 (1990)
577 A.2d 862
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN JAMES CARROLL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted April 30, 1990.
Decided July 23, 1990.
*552 Before Judges J.H. COLEMAN, MUIR, Jr. and SKILLMAN.
Wilfredo Caraballo, Public Defender, attorney for appellant (William Welaj, Designated Counsel, of counsel and on the brief).
Robert J. Del Tufo, Attorney General, attorney for respondent (Michael J. Williams, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
*553 Defendant was convicted by a jury of purposeful or knowing murder, in violation of N.J.S.A. 2C:11-3a(1) and N.J.S.A. 2C:11-3a(2), and possession of a weapon with the purpose to use it unlawfully against another, in violation of N.J.S.A. 2C:39-4d. The court merged defendant's conviction for possession of a weapon with the purpose to use it unlawfully with his conviction for murder and sentenced him to life imprisonment with a 50 year period of parole ineligibility.
Defendant met the victim's mother, Clova Corretjier, in 1975 and married her in 1979. Clova had two daughters at that time, the victim, Maria, and Savasti. The parties also had a son who was born in 1980. The relationship between defendant and Clova was stormy, involving constant arguments and several separations. In May 1983 the couple moved to Trenton and rented a house. However, Clova filed a domestic violence complaint against the defendant and obtained a restraining order on July 12, 1983, forbidding him from returning to the house or having any contact with her or the children. Over the next five months, the defendant often called Clova and asked her to take him back but she consistently refused. He became very upset when she did not visit him, having given her a car for that purpose. Thereafter, he threatened her, stating that he felt like going over to her residence and "blowing everybody's heads off, kill everybody."
On the day of the murder, December 2, 1983, Clova left for work at around 6:30 a.m. while her three children were still asleep. According to the State's evidence, provided partly through the testimony of Savasti, who was then seven, and partly through scientific analysis of the crime scene and autopsy of the victim's body, defendant came into the bedroom where his two stepchildren and son were sleeping, forced Maria, who was then thirteen, to leave the room with him, and then viciously assaulted her by hitting her over the head with a scale and stabbing her numerous times with a knife. The blows on *554 the head crushed her skull and one of the stab wounds penetrated at least four inches into her throat. After committing the crime, defendant returned to the bedroom and told Savasti that he would come back and kill her if she said anything about what had happened.
Defendant was apprehended by the F.B.I. in South Carolina four months after the murder, at which time he gave an inculpatory statement that is quoted extensively in section II of this opinion.
Defendant did not testify at trial. However, he presented expert testimony by a psychiatrist and a neurologist which is discussed extensively in section I of this opinion.
On appeal, defendant makes the following arguments:
I. THE TRIAL COURT'S CHARGE TO THE JURY REGARDING DIMINISHED CAPACITY IMPROPERLY SHIFTED THE BURDEN OF PROOF TO THE DEFENDANT, CONSTITUTING REVERSIBLE ERROR. (Partially Raised Below).
II. THE TRIAL COURT ERRED IN PERMITTING THE STATE TO ELICIT THAT PORTION OF THE DEFENDANT'S STATEMENT TO THE POLICE EVIDENCING PRIOR CRIMINAL CONDUCT OVER A DECADE EARLIER.
III. THE TRIAL COURT ERRED PERMITTING INTO EVIDENCE THE DEFENDANT'S STATEMENT.
IV. THE SENTENCE IMPOSED, INVOLVING A LIFE IMPRISONMENT TERM WITH A 50 YEAR PAROLE DISQUALIFIER REGARDING THE MURDER CONVICTION, WAS ILLEGAL.
We reject defendant's first three arguments which relate to the conduct of the trial court and affirm the judgment of conviction. However, we agree with defendant that the parole ineligibility component of the sentence imposed upon him was illegal. Therefore, we modify the sentence to reduce the period of parole ineligibility from 50 to 30 years and, as thus modified, we affirm the judgment of conviction.

I
Defendant argues that the trial court imposed the burden of proof as to diminished capacity upon him and thereby violated *555 his due process right to have the State prove each and every element of the crime charged beyond a reasonable doubt.
The defense of diminished capacity is established by N.J.S.A. 2C:4-2, which provides:
Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence. [Emphasis added].
In arguing that the burden of proof as to diminished capacity was improperly imposed upon him, defendant relies upon the Third Circuit Court of Appeals' decision in Humanik v. Beyer, 871 F.2d 432 (3rd Cir.1989), cert. den. ___ U.S. ___, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989), which held that an instruction to the jury that a defendant has the burden of proving the existence of a mental disease or defect by a preponderance of the evidence denies him due process of law. In essence, the court in Humanik held that placing the burden on the defendant to prove a mental disease or defect by a "preponderance of the evidence" violates the Due Process Clause by acting as a "filter" which may bar the jury's consideration of that evidence when the time comes to decide whether the State has proved the requisite state of mind beyond a reasonable doubt.
The decision in Humanik was made binding upon this court by a memorandum from the Chief Justice, on behalf of the Supreme Court, dated December 8, 1989, which stated:
On October 27, 1989, on behalf of the Supreme Court, I advised you, for the reasons therein expressed, that New Jersey courts should no longer require criminal defendants who raise the defense of mental disease or defect under N.J.S.A. 2C:4-2 to prove the existence of the mental disease or defect by a preponderance of the evidence. Currently, N.J.S.A. 2C:4-2 provides that mental disease or defect is an affirmative defense that the defendant must prove by a preponderance of the evidence. State v. Breakiron, 108 N.J. 591 [532 A.2d 199] (1987). Placing this burden of proof on the defendant was held to be unconstitutional by the Third Circuit Court of Appeals in Humanik v. Beyer, 871 F.2d 432, cert. denied, ___ U.S. ___, 110 S.Ct. 57 [107 L.Ed.2d 25] (1989).

*556 The further question has arisen whether Humanik should be applied to pending appeals. The Court has concluded for the same reasons that it should. Of course, that fact does not require a reversal of every case presenting a diminished capacity issue. Other appellate principles may dictate a different result. [124 N.J.L.J. Index Page 1133 (1989)].
Therefore, the principles set forth in Humanik must be followed in deciding this appeal.
The trial court instructed the jury regarding the defense of diminished capacity as follows:
I have just instructed you on the elements the State must prove beyond a reasonable doubt for you to find the defendant guilty of murder. Specifically, the elements were purposely and/or knowingly. The defense claims through the testimony of its witnesses that the defendant did not act purposely and knowingly, but that he acted recklessly. The State contends through the testimony of its witnesses that the defendant did act purposely and/or knowingly.
The defense further contends that the inability of the defendant to act purposely and/or knowingly under the facts of this case were brought about by a mental disease or defect.
Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have the state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense.

It is the burden of the defendant to prove the existence of a mental disease or defect by a preponderance of the evidence. Any mental disease or defect must be relevant to the issue of whether the act or acts alleged to have been committed by the defendant were done by him either purposely or knowingly. And if a mental disease or defect is proved to exist by a preponderance of the evidence, that does not automatically mean that the defendant should be acquitted because many mentally disturbed persons are capable of acting purposely or knowingly.
Thus, the jury may find that a person suffering from a mental disease or defect either could act and did act purposely or knowingly or could find that such person could not act or did not act purposely or knowingly.
To resolve such an issue, you must consider all of the evidence, including the facts surrounding the alleged crimes themselves, the opinions of any experts regarding the existence and extent of any mental disease or defects, the foundations of those expert opinions and any other evidence that the jury may find relevant to the question of whether the defendant committed the acts purposely or knowingly.
The term preponderance of the evidence means the greater weight of the credible or believable evidence. It does not necessarily mean the evidence or testimony of the greater number of witnesses, but means that evidence which carries the greater convincing power in your minds. Keep in mind, however, *557 that although the burden rests upon the defendant to establish mental disease or defect by a preponderance of the credible evidence, the burden of proving the defendant guilty of the offense charged beyond a reasonable doubt is always on the State, and that burden never shifts to the defendant.
This instruction imposed the "preponderance of the evidence filter" on defendant's mental disease or defect evidence which the court found unconstitutional in Humanik. Therefore, the instruction was erroneous.
However, we further conclude that this error was harmless because defendant failed to present evidence of the kind of mental disease or defect which would negate the mental state required to convict him of murder. To justify submission of the defense of diminished capacity to the jury, a defendant must show
(1) that the condition he purports to establish is relevant to his ability to have formed the requisite criminal mental state; (2) that the medical theory underlying the effect of the condition upon the relevant mental state is generally accepted within the scientific community; and (3) that the evidence defendant plans to adduce is relevant to show the existence of the condition. [State v. Breakiron, 108 N.J. 591, 619, 532 A.2d 199 (1987)].
And to qualify as evidence of a "mental disease or defect" within the intent of N.J.S.A. 2C:4-2, "at a minimum the evidence must be shown to be able `to negate a mental element of the crime charged,' or to otherwise impair cognition." Id. at 619, 532 A.2d 199 (citations omitted). Therefore, "[n]ot every mental disease or defect has relevance to the mental states prescribed by the Code.... Some, such as depression or anti-social disorders, have little or no relevance to knowledge." Id. at 618 n. 10, 532 A.2d 199.
Thus, in State v. Pitts, 116 N.J. 580, 607-610, 562 A.2d 1320 (1989), the Court concluded that the psychiatric testimony presented by defendant was not of a character which required the court to submit a diminished capacity instruction to the jury. The Court noted that:
[Defendant's psychiatrist] did not testify that defendant's state of mind when he stabbed the victims was caused by his mental disorders; rather, he based his opinion on what defendant had told him about the homicides and on the physical evidence, as well as on his testing of defendant. Nor did [defendant's psychiatrist] *558 testify that defendant's particular mental disorders were generally acknowledged among psychiatrists to be capable of affecting one's ability to possess the state of mind required by the Code for murder. Rather, the thrust of [defendant's psychiatrist's] testimony was that defendant committed the homicides in a state of rage, provoked by his emotional reaction to the encounter with [one of the victims]. Id. at 610 [562 A.2d 1320].
In upholding the trial court's failure to submit aggravated manslaughter to the jury as a lesser included offense, the Court further explained that:
Examined in the context of the entire trial, defendant's proofs attempted to persuade the jury that the homicides, although committed deliberately, were the product of impassioned impulse, provoked by circumstances that caused defendant to lose control of his emotions. The thrust of defendant's proofs was that his actions were uncontrollable, not that his conduct was reckless in the sense of consciously disregarding a known risk. Id. at 613-614 [562 A.2d 1320].
We read Breakiron and Pitts to distinguish between a case in which there is evidence of a mental disease or defect which impairs the cognition required to act knowingly, purposely or with whatever other mental state is required to commit a particular offense, thus requiring the defense of diminished capacity to be submitted to the jury, and a case in which there is evidence of a mental disease or defect which produces an emotive reaction such as rage or impassioned impulse, where a diminished capacity defense is not required to be submitted to the jury.
Moreover, we are satisfied that defendant failed to present evidence that he suffered from a mental disease or defect which impaired his cognitive faculties so as to prevent him from acting purposely or knowingly. Defendant presented expert testimony regarding his mental condition by a psychiatrist, John Liccardo. Dr. Liccardo testified that defendant suffered from "atypical psychosis," "organic brain syndrome" and "borderline or mixed personality disorder" and was a "chronic substance abuser." In response to defense questions as to the effect of these disorders upon defendant's mental functioning at the time of the offense, Dr. Liccardo stated:
I think with the unfortunate combination of the alcohol intoxication or use at the time, coupled with the organic brain syndrome and his personality disorder, *559 I think this distorted his ability to, to judge. And his judgmental ability, in my opinion, was never very good, but if you add the alcohol to it, this further impairs his judgment. It also further impairs impulse control, I think that you don't have to be a psychiatrist to know that, either. I'm sure you know when any normal person drinks too much, they frequently can't control their impulses, and so you see that very frequently. But if you take a person who already has difficulty with impulse control, and who already has poor judgment and you add this on top of it, and then you know that he's going to be functioning very, in a very poor manner.
* * * * * * * *
I felt that because of the combination of factors, he acted in a way that was extremely reckless, without considering whatever the consequences might be. He obviously became enraged for whatever reason, and made no attempt to control himself.
Defense counsel also elicited the following testimony by Dr. Liccardo as to his basis for concluding that defendant acted "recklessly" rather than "purposely" or "knowingly":
Q. Why is it, then, that it is your opinion in this case that Mr. Carroll acted in a reckless fashion?
A. Because of the, as I said, the combination, the fact that he has a personality disorder, one of the main characteristics of which is impulsivity, that organic, organicity, organic brain syndrome tends to make people impulsive. I think even with those two alone, his history indicates that he had made lots of threats, but rarely carried them out. But on the day that he was apparently intoxicated, and by his own estimation drinking a lot, he was not able to control his impulses. He's had a history of acting out at times, but it generally was when he was using alcohol.
* * * * * * * *
Q. In any event, Doctor, it is your opinion that the combined effect of alcohol and these disorders created a reckless state in this case?
A. That's right, because the amount would be individual to the person drinking, so a small amount for one person could be a large amount for another person. And I cannot give you, I can't quantify it, but I can say that a person with his particular combination of problems would need less than someone else to be able to be in a position where he couldn't control his anger and impulses.
Dr. Liccardo further explained his view of defendant's mental disease or defect during cross-examination, as follows:
Q. Now, Doctor, you've already testified, have you not, that at the time John Carroll picked up the scale, he knew he was picking up the scale?
A. Uh-huh.
Q. And at the time that he hit Maria Carroll, he knew that he was hitting Maria Carroll, and that at the time he took the knife from wherever he took it *560 that he knew he was taking a knife, and that when he stabbed Maria Carroll in the throat, that he knew he was stabbing her in the throat?
A. That's right.
Q. Now, then, is that not knowing behavior in your judgment, Doctor, the definition of knowing that you just read?
A. Well, again, when I evaluated the person, I felt that reckless  I have difficulty with, I try to put things in the simpler way so that I can understand it, recklessness in my frame of reference means that you do something, regardless of the consequences. You may know it's wrong, you don't care or you don't, at that particular moment it's reckless behavior because you're not interested or not worried or not concerned about the consequences. I felt that he did know that it was a wrong thing to do, but I don't think that he did it purposely, you know, with an idea I want to kill my stepdaughter, and knowingly, this is the way I'm going to do it. I just think he was very furious, and acted out of impulse in a totally reckless manner, without regard to consequences.
* * * * * * * *
The important thing that I base my whole opinion on is that this man was drinking, this led to a decreased capacity, diminished capacity on his part.... He became enraged and was unable to control himself. He had become enraged other times when he wasn't drinking, and he could control himself.
* * * * * * * *
Q. So again, Doctor, Mr. Carroll, right up until the time that he began to strike Maria Carroll with a scale, was capable of acting with a reason, whether that reason is laudatory or acceptable, he was capable of acting with a reason, correct?
A. He was acting impulsively with an insufficient reason. And that's the whole basic, that's my premise, that he acted impulsively, he did something that he normally would not of done. He's basically someone who has difficulty controlling his impulses, if he drinks and is, as we said yesterday, I don't know the exact amount, small amounts in a man like that can cause him to act even more irrationally and more impulsively.
Therefore, while Dr. Liccardo stated in conclusionary terms that defendant's mental condition prevented him from acting "purposely" or "knowingly," it is clear from a review of Dr. Liccardo's entire testimony that his view was that the combination of underlying mental diseases and consumption of alcohol caused defendant to become enraged and to lose control of his impulses. However, Dr. Liccardo never stated that defendant suffered from an impairment of his faculties which prevented him from being cognizant of the fact that he was hitting his stepdaughter over the head with a scale and stabbing her in the *561 throat with a knife and that it was practically certain his actions would cause death or serious bodily injury to the child. See N.J.S.A. 2C:11-3a(2). Therefore, Dr. Liccardo's testimony did not mandate a jury instruction as to the defense of diminished capacity.
Defendant also presented expert testimony regarding his mental condition by a neurologist, Gregory Piacente. Dr. Piacente's conclusions were similar to those of Dr. Liccardo. He stated that defendant's intellectual impairment and consumption of alcohol caused him to lose "impulse control" and that he was "acting in a fury, in a rage" when he committed the murder. In response to defense counsel's question as to whether defendant had acted "purposely," "knowingly," or "recklessly" when he killed the victim, Dr. Piacente testified:
Q. Are you familiar with the New Jersey's legal standards regarding state of mind?
A. Yes, I've reviewed those.
Q. And you are familiar with purposeful and knowing and reckless?
A. Yes.
Q. And would you recount them for me, please?
A. All right. Purposeful, in my understanding of purposeful is that there was, that the end result was specific intent, that he planned to do something premeditated might be how I would term it.
Q. That's purposeful?
A. Purposeful.
Q. What about knowing?
A. Knowing is that you understand what the result is, or what the result could be of your action. Reckless being knowing what the result could be, but not caring.
Q. Okay. And do you have an opinion, based upon all of the data available to you, as to which state of mind Mr. Carroll would likely have been functioning under when this incident occurred on December the 2nd, 1983?
A. Yes.
Q. What is that opinion?
A. I think he was acting, it's my opinion that he was acting in a reckless manner, but specifically not purposeful.
Q. Can you draw an example from your own memory as to how to explain that reckless conduct?
A. I think there's no doubt that he was violent, that he bludgeoned Maria, that he attacked her, that he was furious, that he was punishing her for whatever *562 real or assumed or delusional beliefs that he had. But I don't believe he had a specific intent or purpose of killing her, I think he was 
But on cross-examination, Dr. Piacente provided this further explanation of the meaning of the terms "reckless" and "knowing" as applied to defendant's killing of Maria Carroll:
Q. What's it [sic] is difference, Doctor, between reckless and knowing behavior in New Jersey law?
A. My understanding is that reckless assumes knowing, assumes that you know the consequences of your act, but you don't care, you don't change your acts because you know that information.
Q. And he was aware that he was picking up the scale, you have no doubt that when he picked up the scale, he knew what he was doing?
A. No, I have no doubt that he knew he was picking up a scale.
Q. And you have no doubt, do you, that when he picked up the scale and swung it at Maria Carroll's head, that he knew that's what he was doing?
A. I know, I agree I think he knew that he was hitting her.
Q. And when he hit her again, he knew that?
A. Yes.
Q. And when he stabbed her, he knew that?
A. Okay, Again, I don't know that he stabbed her, but assuming that those lacerations or cuts were a stab wound then, then yeah, I think he knew that he was harming her, I think he knew he was hurting her.
Q. And all you're saying is he didn't think out to the end, and care whether he lived  whether she lived or died, and that's what differentiates knowing from reckless?
A. I said earlier that I assume that reckless presumed that someone knew. I did not at any point say he wasn't knowing.
Thus, Dr. Piacente's conclusion that defendant acted "recklessly" rather than "purposely" or "knowingly" was not based on a psychiatric finding that defendant's cognitive faculties were so impaired that he was unaware that his actions were practically certain to cause death or serious bodily injury to Maria Carroll but rather on the misimpression that a person who is indifferent to the consequences of his actions (who does not care whether his victim lives or dies) cannot be found to have acted knowingly or purposely within the intent of N.J.S.A. 2C:2-2b(2) and (3) and N.J.S.A. 2C:11-3a(1) and (2). Therefore, we conclude that this testimony did not require the submission of a diminished capacity defense to the jury.
*563 Finally, we find no basis for concluding that the trial court's erroneous instructions as to the burden of proof on the defense of diminished capacity could have prejudiced defendant even though that defense should not have been submitted to the jury at all. The evidence that defendant was the killer was overwhelming, consisting of eyewitness testimony placing him at the scene of the offense, his own inculpatory statements and scientific analysis of the crime scene. Therefore, the only possible consequence of the court's erroneous admission of psychiatric evidence of defendant's mental disease or defect and instruction to the jury regarding the defense of diminished capacity would have been to improve defendant's chances of securing an acquittal. Therefore, the erroneous jury instructions were harmless beyond a reasonable doubt. See Burger v. Kemp, 483 U.S. 776, 782 n. 5, 107 S.Ct. 3114, 3119-3120 n. 5, 97 L.Ed.2d 638 (1987); cf. State v. Murray, 240 N.J. Super. 378, 399, 573 A.2d 488 (App.Div. 1990) ("Before a jury issue can arise with respect to the existence of a mental disease or defect, and the absence of the requisite state of mind as a result thereof, a defendant must come forward with competent reliable evidence about the existence of such a disease or defect which a reasonable juror could credit.").

II
Defendant also argues that the trial court committed reversible error by admitting a portion of his oral statement to two F.B.I. agents in which he referred to an act of violence he committed upon his first wife in the early 1970's which resulted in his incarceration. The part of one F.B.I. agent's testimony pertinent to this argument reads as follows:
He stated that in the past when he has become angry, he becomes so enraged that he says and does things that he does not even realize he is saying or doing. He stated that he is totally convinced that he is not sane when he becomes angry or enraged, and that after his wife left him he felt like an insane person. He explained further that it was as if another person was occupying my body. Carroll stated he did not really know whether or not he killed his step-daughter Marie or not, due to the fact that he became so enraged over his wife leaving *564 him and marrying another man. He stated that he did not know whether he hurt his step-daughter or killed her. He stated that other person occupying my body could have killed my stepdaughter.... He stated that the person inside him that takes over when he becomes enraged or angry apparently would do something to get back or retaliate against his wife. He explained that it is much like revenge, that the anger comes out in the form of revenge, and that in this case he had to seek revenge. He stated that to satisfy this revenge the other person inside him must strike out and keep hitting and hitting until the revenge is subdued. He stated that this other person inside him would strike out and hurt anyone who he might want to get back at, and especially someone who looked like the person he was seeking revenge against. He stated his step-daughter, Marie, is a carbon copy of his wife, however, so are the other children. He stated that if he could have just thought, if he were just sane enough, he could have told that other person inside him to hold off, however, he cannot control that other person when he becomes so enraged. Carroll stated that all his life he has tried to help people, however, he always seems to end up being let down. Carroll stated he had the same problem with his first wife, a woman named Lucille Small. He stated that in 1972 he ended up doing time after his rage took over, and that other person inside him ended up hurting his first wife. He stated that his wife Clover [sic] and his first wife Lucille were a carbon copy of one another, and that, and they did the same things to him, and that they were responsible for making the other person come out inside him and seek revenge by hurting these individuals. (Emphasis added).
Defendant argues that the part of his statement which referred to his alleged earlier assault upon his first wife was inadmissible under Evidence Rule 55, which provides:
Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.
We agree with defendant that evidence of other crimes may be inadmissible under Rule 55 even though its source is defendant's own statement. State v. Schumann, 111 N.J. 470, 476, 545 A.2d 168 (1988). However, defendant's reference to his assault upon his former wife was so integral a part of his description of his state of mind at the time of his commission of this offense that it was admissible to show his intent in attacking his stepdaughter.
*565 The admissibility of a defendant's statements about his own alleged prior criminal acts has been recognized under similar circumstances. In State v. Butler, 32 N.J. 166, 187, 160 A.2d 8 (1960), cert. den. 362 U.S. 984, 80 S.Ct. 1074, 4 L.Ed.2d 1019 (1960) a defendant's reported statement during a homicide that "It ain't the first man I ever killed" was held to be relevant to establish that the murder was "willful, deliberate and premeditated."
Therefore, we are satisfied that the F.B.I. agent's testimony as to defendant's reference to the assault he committed upon his first wife was relevant to his intent and hence admissible under Rule 55. We are also satisfied that the trial court did not abuse its discretion under Evidence Rule 4 in concluding that the probative value of this evidence was not substantially outweighed by the danger of undue prejudice.
Furthermore, even if we concluded that the F.B.I. agent's testimony regarding defendant's inculpatory oral statement should have avoided any reference to his assault upon his first wife, we would further conclude that the error was harmless because defendant's references to that assault inevitably would have been brought out in the questioning of the psychiatric experts. In fact, defendant's statement regarding his assault upon his first wife was mentioned in the reports of all his psychiatric experts as pertinent to their evaluation of his psychological condition.

III
Next defendant argues that his statement to the F.B.I. agents should not have been admitted into evidence because he did not knowingly and intelligently waive his right to the presence of counsel. This argument is clearly without merit and does not require extended discussion. R. 2:11-3(e)(2). The record clearly indicates that defendant initiated the discussions with the F.B.I. agents leading to his inculpatory statement. Indeed, defendant's statement was essentially a monologue *566 without questioning by the agents. When a defendant initiates communications with law enforcement officers "nothing in the Fifth and Fourteenth Amendments prohibits the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." Edwards v. Arizona, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). Moreover, the agents readvised defendant of his rights before he began to speak and defendant stated that he fully understood those rights. Consequently, we can find no basis in this record to disturb the trial court's finding that defendant made a voluntary and knowing waiver of his constitutional rights. See State v. Fuller, 118 N.J. 75, 570 A.2d 429 (1990) (Police not required to readminister Miranda warnings after suspect invoked right to silence, then himself initiated a conversation regarding the investigation).

IV
Finally, defendant argues, and the State concedes, that the 50-year period of parole ineligibility which the trial court imposed upon him is unauthorized by N.J.S.A. 2C:11-3b and hence illegal. We agree. This court specifically held in State v. Scales, 231 N.J. Super. 336, 340, 555 A.2d 707 (App.Div. 1989), certif. den. 117 N.J. 123, 564 A.2d 851 (1989), that the maximum period of parole ineligibility that can be imposed for murder is 30 years.
Accordingly, we modify the sentence imposed upon defendant to reduce the period of parole ineligibility from 50 to 30 years and, as thus modified, we affirm the judgment of conviction.