261 N.J. Super. 169 (1992)
618 A.2d 367
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CARLYLE WATSON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 1, 1992.
Decided December 18, 1992.
*171 Before Judges MICHELS, BILDER and BAIME.
Stephen A. Caruso, Assistant Deputy Public Defender, argued the cause for appellant (Zulima V. Farber, Public Defender, attorney; Stephen A. Caruso, of counsel and on the brief).
James E. Jones, Jr., Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; James E. Jones, Jr., of counsel and on the letter brief).
The opinion of the court was delivered by BILDER, J.A.D.
Following a jury trial, defendant Carlyle Watson was found guilty of knowing and purposeful murder, murder while committing a kidnapping, murder while committing a robbery, and possession of handguns for an unlawful purpose. He was sentenced to concurrent custodial terms of life with a minimum of thirty years for each of the murder convictions. The weapons conviction was merged in the murder convictions.
About 9:25 p.m. on the evening of January 14, 1988, Ann Valle was shot in the head while seated in her car in front of her home in New Milford. She described her assailants as "two black guys."
She was taken to the Hackensack Hospital where examination disclosed a hole in the middle portion of her forehead, subdural hematoma, multiple bullet fragments in the brain and extensive injury to the brain on both sides of the frontal area. Surgical interventions on the 14th and again on January 19th were unavailing. Following the first surgery, she remained unconscious and on a respirator until January 24th when EEG *172 readings disclosed a lack of brain activity. Upon removal from the respirator, she was pronounced dead. The cause of death was a gunshot wound of the brain from a gun two feet or less from her head.
Later that night, defendant Carlyle Watson and a companion Donald Henry were arrested in Teaneck in the course of an unconnected investigation of automobile break-ins. Watson and Henry had parked the Hyundai in which they were riding near a bus stop and phone booth on Route 4. Teaneck police officers who came to the area in an effort to find the perpetrators of the automobile break-ins chanced upon the two and were ultimately led by their actions to investigate and finally take them into custody. In the course of that, Watson was found to have two handguns, a .22 calibre and a .38 calibre, in his possession; Henry unsuccessfully fled the scene, and the Hyundai was found to have been stolen.
After being arrested, defendant and Henry were taken to police headquarters where questioning ultimately revealed their participation in the attack on Mrs. Valle, as well as their theft of the Hyundai about a week before, January 9, 1988. Defendant's confession revealed a plan to seize Mrs. Valle, the night supervisor of the Bergenfield Sears store, and force her to return to the store and open the safe. When Mrs. Valle resisted and screamed, she was shot. Defendant's confessions were corroborated by the accuracy of details; the possession of a .22 calibre handgun, a weapon consistent with the injury to Mrs. Valle's brain and the bullet fragments found there; evidence of the victim's hair on Henry's pants and fibre from Henry's hat on the victim's sweater; testimony from a co-worker of Mrs. Valle that Henry had also been a co-worker at the Bergenfield Sears store where Mrs. Valle was a night supervisor and that he had verified earlier on January 14th that Mrs. Valle would be on duty. The evidence, if accepted by the jury, overwhelmingly established defendant's guilt beyond a reasonable doubt.
*173 In his brief on appeal defendant makes the following contentions:
POINT I
THE STATUTE, N.J.S.A. 2C:4-2, DEFINING THE DEFENSE OF MENTAL DISEASE OR DEFECT, ON ITS FACE AND AS CHARGED TO THE JURY, SHIFTED THE BURDEN OF PROOF TO THE DEFENDANT IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW. (U.S. CONST. AMEND. XIV; N.J. CONST. (1947), ART. 1, PAR. 1). (Not Raised Below).
POINT II
THE STATEMENTS TAKEN FROM DEFENDANT WERE NOT VOLUNTARILY MADE AND THEIR ADMISSION INTO EVIDENCE DEPRIVED DEFENDANT OF DUE PROCESS OF LAW AND VIOLATED HIS PRIVILEGE AGAINST SELF-INCRIMINATION. (U.S. CONST. AMENDS. V, XIV; N.J. CONST. (1947), ART. 1, PAR. 1).
POINT III
THE COURT BELOW ERRED IN NOT GRANTING THE MOTION TO SUPPRESS SINCE THE WARRANTLESS SEARCH OF THE DEFENDANT VIOLATED THE PROTECTIONS GUARANTEED BY THE FEDERAL AND NEW JERSEY CONSTITUTIONS.
POINT IV
THE TRIAL JUDGE'S FAILURE TO CONDUCT A HEARING OR TO INDIVIDUALLY VOIR DIRE THE JURORS AFTER RECEIVING INFORMATION THAT THE JURORS UTILIZED EXTRA-JUDICIAL MATERIAL DURING THEIR DELIBERATIONS DEPRIVED THE DEFENDANT OF A FAIR TRIAL AND AN IMPARTIAL JURY. (Not Raised Below).
POINT V
THE SENTENCE IMPOSED BY THE TRIAL JUDGE IS EXCESSIVE AND INAPPROPRIATE UNDER THE MANDATE OF THE CODE OF CRIMINAL JUSTICE.

I. The Suppression Motions

Prior to trial, defendant moved to suppress evidence obtained from him in connection with his arrest and the investigation which immediately preceded it. He also moved to suppress the confessions he gave during some 24 hours following his arrest. He contends that there was no legal basis for the initial stop and investigation and that the confessions were involuntary and inadmissible products of a process whereby his will was overborne by the length and nature of the questioning.

*174 The Arrests

On the evening of January 14, 1988, in the course of investigating a series of car burglaries[1], Officers Castellucci and Bayersdorfer of the Teaneck Police Department went to the point where Phelps Road dead-ends into the southern side of Route 4. They went to this location because the pattern of burglaries seemed headed north and their accumulated experience[2] had taught them that individuals who committed crimes in this area often headed north to Route 4 where they crossed the highway on a pedestrian overpass, hid the goods by the highway, or tried to escape to New York.
When they arrived at Route 4, the officers saw a small white car stopped about 30 feet south of Route 4 in a no parking area on the west curb of Phelps Road, facing south with its engine running and its emergency flashers blinking. A man, later identified as defendant, was seated in the front passenger seat.
They also saw another man, later identified as codefendant Donald Henry, on the south side of Route 4 just east of Phelps Road near a phone booth and bus stop. Castellucci walked slowly toward Henry and as he did so the latter moved to within inches of Route 4 and within one or two feet of the highway's speeding traffic. When asked why he was so close to the edge of the highway, Henry gave a muffled response and moved three or four steps to the bus stop. When asked to identify himself, Henry gave what appeared to be a satisfactory answer, although Castellucci noted an appearance of nervousness. The officer then walked south to see if any burglary proceeds had been hidden in the area. While doing this, he *175 continued to keep an eye on Henry, who had gone to the phone and gave the appearance of making a call.
Meanwhile, Bayersdorfer was searching the pedestrian overpass for hidden burglary proceeds or perhaps even a hiding individual. When he passed the bus stop, he asked Henry if the illegally parked car was his, to which Henry responded, "I don't have a car." At this point, Watson got out of the nearby parked car and started walking south on Phelps Road. Castellucci decided further investigation was required and told Henry to come to his police car with him.
When Watson left the car, Bayersdorfer asked a backup car to stop him. When Henry heard the radio request, he ran from Castellucci and fled north across Route 4, jumping the center divider. In the meantime, Officer McLaughlin was walking north on Phelps Road with Watson. Bayersdorfer asked whether the car was his and received the same kind of answer Henry had given, "That is not my car. I was getting a ride from that guy."
Observing that Watson was wearing a heavy black leather jacket and had his hands deep in his pockets, with an awareness of all that had transpired and the neighborhood he was in, Bayersdorfer became concerned for the safety of himself and the other officers. A pat-down search disclosed a weapon-like object. He reached in and pulled out a .22 calibre revolver. A search of the other pocket revealed a .38 calibre automatic handgun. Watson was arrested on the spot; an alarm was broadcast for Henry. Watson was given Miranda warnings and blurted out "I didn't do anything. I just got a ride. He asked me to hold his guns." Watson was then driven to headquarters and all conversation ceased. A search incident to his arrest disclosed eight .38 calibre bullets in Watson's pocket.
At about the same time as Watson was being arrested and taken to police headquarters, in response to radio messages of his flight and the discovery of guns, Henry was located by other officers, arrested and taken to police headquarters. A *176 search incident to Henry's arrest disclosed the presence of six.22 calibre bullets in his pocket.
Prior to trial, defendant moved to suppress the evidence obtained as a result of the search of his person. Following four days of testimony, the trial judge denied the motion. In her oral decision of November 17, 1988, she carefully analyzed the evidence, made findings of fact which we are satisfied are supported by sufficient credible evidence in the record, see State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964), and properly examined and applied the applicable law. We are satisfied her denial of the suppression motion should be affirmed substantially for the reasons given by her in her oral opinion.

The Confession
Once Watson and Henry were at headquarters, each was separately questioned over the next hours. The questioning of Watson lasted almost 24 hours, interrupted by only one four-hour period of sleep.
Miranda[3] warnings were given prior to the initial questioning and repeated some nine times thereafter, immediately prior to the giving of a new statement. The trial judge found that the longest period between such warnings was 90 minutes and that defendant understood and voluntarily waived his rights. Although offers were made, Watson had nothing to eat or drink from 10 p.m. until 4 a.m. or 5 a.m. the next morning when he was given a hamburger and a cup of coffee; food and drink were not provided only because defendant declined the offers. The trial judge found that throughout the questioning defendant was calm, cooperative, lucid and intelligent; that he was in good physical condition and did not appear tired; and that no promises or threats were made to him.
*177 Shortly after Watson's arrest, the police learned that the parked white car was stolen. Their questioning initially related to the car and the weapons which had been found on Watson. However, by about 11 p.m., the police had become aware of the mugging of a woman in New Milford. When asked, Watson admitted involvement, explaining that she was the manager of the Bergenfield Sears store and that he and Henry had tried to take her back to the closed store and open the safe. He minimized his own participation, merely indicating that Henry had apparently had some problems with her and she would not accompany them. Later it was learned the woman had been shot and was not expected to survive. Watson admitted he knew of the shooting but attributed it to Henry. Over the next hours, as more information came out and the questioning was broadened to involve more detectives and prosecutor's personnel, the story changed until defendant finally admitted all the details of the shooting, including the plan for the robbery of the Sears store. The final statement was started at 7:15 p.m. on January 15, 1988, some 21 hours after Watson's arrest.
Following a number of days of testimony, in an oral opinion of November 17, 1988, the trial judge denied defendant's motions to suppress and ruled his confessions admissible. She made extensive, detailed findings of fact, all of which we find supported by substantial credible evidence in the record. See State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). She also carefully considered and discussed the applicable principles of law and crafted the appropriate conclusions of law. We are satisfied that the denials of defendant's motions should be affirmed substantially for the reasons given by the trial judge in her oral opinion of November 17, 1988. We add only this thought. With respect to the conduct of the police at the Route 4 scene where defendant, his companion and the illegally parked car were first seen, it is important to understand that the propriety of the action of the police officers must be tested by its objective reasonableness. See State v. Bruzzese, 94 N.J. 210, 219, 463 A.2d 320 (1988), cert. den., 465 U.S. 1030, 104 *178 S.Ct. 1295, 79 L.Ed.2d 695 (1988). We entertain no doubt as to the reasonableness and propriety of the actions of Officers Castellucci and Bayersdorfer. With respect to defendant's claim that his will was overborne by the lengthy interrogation, it is important to note that he made known his participation in the Valle attack early on and at a time when the police were unaware of its dimensions. The critical evidence of defendant's participation in her killing were disclosed in the first few hours.

II. The Diminished Capacity Defense

Defendant contends, for the first time on appeal, that a diminished capacity instruction given to the jury improperly shifted the burden of proof to him in violation of the holding of Humanik v. Beyer, 871 F.2d 432 (3d Cir.1989), cert. den., 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989), a ruling which our court has made binding in all pending appeals. See State v. Moore, 122 N.J. 420, 431, 585 A.2d 864 (1991). The State concedes the charge was erroneous but contends the error was harmless because there was no evidence of the kind of mental disease or defect which would negate the mental state of purposeful and/or knowing conduct. Id.; State v. Carroll, 242 N.J. Super. 549, 555-563, 577 A.2d 862 (App.Div. 1990); also State v. Russo, 243 N.J.Super 383, 392-396, 579 A.2d 834 (App.Div. 1990). We agree.
To justify a diminished capacity instruction, there must have been evidence that defendant suffered from a mental disease or defect which impaired his cognitive faculties so as to prevent him from acting purposely or knowingly. Ibid. Evidence of a mental disease or defect which produces emotional response such as rage or impassioned impulse does not meet the test. State v. Carroll, supra, 242 N.J. Super. at 558, 577 A.2d 862. Depression or anti-social disorders, have little or no relevance. See State v. Pitts, 116 N.J. 580, 608, 562 A.2d 1320 (1989). Indeed, no evidence of mental disease or by way of explanation of defendant's conduct is relevant (or even admissible) *179 unless it bears on whether he had the requisite mental state to commit the homicide; i.e., whether he acted purposely or knowingly. Id. at 609, 562 A.2d 1320.
Our task here is to examine the record to see if evidence existed which would permit the jury to make a finding of diminished capacity. This requires a careful review of expert testimony which is often, and perhaps necessarily, highly technical. In examining the expert testimony, we must keep in mind certain basic principles. First, we must exercise care to avoid becoming impressed or confused by technical language or jargon. Second, we must not parse the technical language but must determine what it is the expert said, free of the aura of the technical language.
In support of his contention that he was entitled to a diminished capacity defense, defendant relies on his two experts, Dr. Frederick Rotgers, a clinical psychologist, and Dr. Arnaldo Apolito, a forensic psychiatrist.
Dr. Rotgers gave three diagnoses: a cognitive slowness of thinking akin to a learning disability (defendant was of low to average intelligence but not retarded); a dependent personality disorder (defendant had great difficulty making decisions for himself and tends to be a follower); a mild substance dependence (a mild alcohol and marijuana dependency). He summarized it thusly:
I think particularly in the context of the incidents surrounding the offense, that these three factors, while none of them by itself is of the severity of degree to say that Mr. Watson didn't know what he was doing that night, taken together, they suggest that at the very least, his judgment was clouded. He's slow. He's under the influence of alcohol and marijuana to some degree, and he's with the person in the world upon whom he is most dependent, the person who was his, in essence, his hero, his father figure, the person who is guiding him through life.
He concluded that it was unclear that these circumstances by themselves constituted diminished capacity. He added, however, that a higher blood alcohol level at the time of the offense might suggest an increased possibility that Watson was experiencing "kinds of cognitive thought difficulties and judgment *180 difficulties that typically happen when someone drinks a large amount of alcohol."
I certainly can state that assuming that Mr. Watson had consumed the amount of alcohol, of over [100] proof rum, that the additional information indicated, and had been smoking marijuana, that his judgment was clouded, that he probably was functioning in a, I would guess, even more slowly in terms of his ability to rapidly assimilate what was going on in the environment and to make an appropriate judgment about it than he would be were he not intoxicated.
Stated in plain language, it was Dr. Rotgers' view that Watson was intellectually slow, was a follower and was mildly drug dependent. Moreover, if Watson had a lot to drink and had been smoking marijuana, his judgment was probably not too good. These conclusions are incapable of supporting a finding in the necessary legal sense of diminished capacity, either individually or in combination.
Dr. Apolito arrived at two diagnostic conclusions: Watson was suffering from a dependent personality disorder and he had an adjustment disorder with disturbance of mood and conduct. Stated in plain language, he found, as had Dr. Rotgers, that Watson was a follower. He also found that Watson was anxious (not unexpected in one facing a murder charge), possibly depressed and a substance abuser (alcohol and marijuana). He expressed this opinion as to Watson's state of mind when he pulled the trigger and sent the bullet flying into Mrs. Valle's brain:
[T]he act itself can be characterized as an antisocial act, which it is, or in reckless disregard for the life of another person. That's clear. However, the psychological circumstances in which he unfortunately was at that time did not allow him to make a conscious decision to perform that act and it was not part of his personal tendency to perform as much [as it was] an act.
As with Dr. Rotgers' opinions, we find these conclusions incapable of supporting a finding in the necessary legal sense of diminished capacity, either individually or in combination. With respect to Dr. Apolito's testimony, it is important to note that he found that Watson was not psychotic  that he was well oriented. Cf. State v. Moore, supra, 122 N.J. at 437, 585 A.2d 864.
*181 In sum, we are satisfied that the evidence was incapable of establishing that there was a mental condition which so impaired Watson's cognitive faculties as to prevent him from acting purposely or knowingly. There was no basis for submitting the diminished-capacity defense to the jury, ergo the defective charge was harmless error.

III.
During jury deliberations, a juror brought a dictionary into the jury room. When it came to the trial judge's attention, she immediately caused it to be removed and instructed the jury not to refer to it and to rely only on her charge. There was no objection by defense counsel. There is nothing in the record to show that the dictionary was used nor, if it was, what use was made of it. We are satisfied that the presence of the dictionary in the jury room was incapable of producing an unjust result.
With respect to the sentence, we note that the felony murder convictions should have merged into that for purposeful and knowing murder. See State v. Russo, 243 N.J. Super. 383, 411, 579 A.2d 834 (App.Div. 1990). The sentence is otherwise unexceptionable. See State v. O'Donnell, 117 N.J. 210, 216, 564 A.2d 1202 (1989); State v. Roth, 95 N.J. 334, 365-366, 471 A.2d 370 (1984).
The convictions are affirmed, the felony murder convictions are merged into the conviction for purposeful and knowing murder and the sentences imposed for felony murder vacated. The matter is remanded for correction of the judgment of conviction.
NOTES
[1] Between 9 and about 9:30 p.m. at least four thefts of radios from cars were investigated and footsteps were noted in snow leading in a northerly direction towards Route 4.
[2] Castellucci had been a Teaneck police officer for nineteen years; Bayersdorfer for fifteen.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).