243 N.J. Super. 383 (1990)
579 A.2d 834
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DAVID RUSSO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 4, 1990.
Decided August 24, 1990.
*388 Before Judges J.H. COLEMAN, MUIR, Jr. and SKILLMAN.
Roy B. Greenman, Designated Counsel, argued the cause for appellant (Wilfredo Caraballo, Public Defender, attorney; Roy B. Greenman and Arnold I. Budin, Designated Counsel, of counsel and on the brief).
Cherrie Madden Black, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Cherrie Madden Black, of counsel and on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
Defendant was convicted by a jury in a capital trial of purposeful and knowing murder, capital murder and felony murder, in violation of N.J.S.A. 2C:11-3a(1), 2C:11-3a(2) and 2C:11-3a(3); armed robbery, in violation of N.J.S.A. 2C:15-1; two counts of attempted murder, in violation of N.J.S.A. 2C:5-1 *389 and 2C:11-3; possession of a handgun for an unlawful purpose, in violation of N.J.S.A. 2C:39-4a; two counts of second-degree aggravated assault, in violation of N.J.S.A. 2C:12-1b(1); and two counts of third-degree aggravated assault, in violation of N.J.S.A. 2C:12-1b(2).[1] Defendant also was acquitted of a charge of possession of a handgun without a permit, in violation of N.J.S.A. 2C:58-4. The jury was unable to agree upon a death penalty verdict. At sentencing, the court merged the knowing and purposeful murder and the felony murder convictions into the capital murder conviction and also merged the convictions for third degree aggravated assault into the convictions for second degree aggravated assault. After these mergers, the court sentenced defendant to a life term, with 30 years of parole ineligibility for murder, 20 years, with ten years of parole ineligibility, on both counts of attempted murder, ten years, with five years of parole ineligibility on both counts of second-degree aggravated assault, ten years, with five years of parole ineligibility for armed robbery, and seven years, with three years of parole ineligibility, for unlawful possession of a weapon. The sentences for murder and armed robbery, one count of attempted murder and one count of aggravated assault were made consecutive, with the other sentences to be served concurrently. Therefore, the aggregate sentence imposed on defendant was life plus 40 years, with 50 years of parole ineligibility.
The offenses for which defendant was convicted were committed on March 7, 1985 at Petteti Motors, a gas and automobile repair station located in Swedesboro, a small Gloucester County community. Defendant had been at the gas station a week or two earlier, when his car was towed there after breaking down on the New Jersey Turnpike. On that occasion, *390 he talked to two of the victims, Joseph Iovanisci and Dino Rossi, while he was filling out paperwork regarding his car and saw them process the gas station's receipts before closing for the evening.
Iovanisci and Rossi were also working when defendant returned to the gas station around 7 p.m. on March 7th. Defendant said that he was meeting someone at a local bar at 7:30 p.m. and that he had stopped by the gas station on his way. Defendant again engaged both Rossi and Iovanisci in casual conversation. Near the time for closing, the third victim, Ann Kiley, arrived to offer Rossi a ride after work. As Rossi was processing the gas station's receipts, defendant suddenly brandished a nine millimeter handgun and told him that this was a "stick up." Defendant then ordered the victims to walk from the office to the parts room of the gas station and to lie on the floor. After the three victims lay down, defendant began firing his gun at point blank range killing Iovanisci and inflicting serious brain damage on Kiley. Miraculously, Rossi, although shot twice, was not seriously injured.
Based on the gas station's towing records, defendant was quickly apprehended. Defendant provided the police with an oral statement, which was tape recorded, that essentially constituted a confession to the crime and also told the police where they could find the murder weapon as well as various other evidence.
At trial defendant relied on the defenses of diminished capacity and voluntary intoxication. In finding him guilty of purposeful and knowing murder, the jury evidently rejected both defenses.
On appeal, defendant makes the following arguments:
I. THE COURT DENIED THE DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL IN CONDUCTING A RULE 8 HEARING ON THE ISSUES OF DIMINISHED CAPACITY IN WHICH HE REQUIRED THE DEFENSE TO CONVINCE THE COURT BY A PREPONDERANCE OF THE EVIDENCE THAT THE CONDITION EXISTED OR THAT IT NEGATED AN ESSENTIAL ELEMENT OF THE OFFENSE.

*391 II. THE COURT SHOULD HAVE CHARGED THE LESSER INCLUDED OFFENSES OF AGGRAVATED MANSLAUGHTER AND MANSLAUGHTER.
III. THE COURT'S CHARGE ON THE DEFENSE OF INTOXICATION WAS IMPROPER AND MISLEADING DENYING THE DEFENDANT A FAIR TRIAL.
IV. THE COURT DENIED THE DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO REPRESENT HIMSELF AT TRIAL.
V. THE DEFENDANTS CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED.
VI. THE PROSECUTOR'S CONDUCT DURING THE TRIAL WAS GROSSLY IMPROPER WARRANTING A NEW TRIAL.
VII. THE TRIAL COURT, BY CERTAIN OF ITS RULINGS, INDICATED A BIAS AGAINST THE DEFENSE, AND DENIED THE DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.
VIII. THE DEATH QUALIFICATION OF THE JURY IN THE CASE SUB JUDICE RESULTED IN A JURY WITH A DISPROPORTIONATE UNDERREPRESENTATION OF BLACKS AND WOMEN.
IX. THE COURT FAILED TO EXCUSE FOR CAUSE A NUMBER OF JURORS DURING VOIR DIRE.

X. THE COURT'S VOIR DIRE OF PROSPECTIVE JURORS WHO WERE IN FAVOR OF THE DEATH PENALTY WAS INADEQUATE IN THAT IT FAILED TO IDENTIFY JURORS WHOSE VIEWS IN FAVOR OF THE DEATH PENALTY WOULD SUBSTANTIALLY IMPAIR THEIR ABILITY TO GIVE A DEFENDANT A FAIR TRIAL.
XI. THE COURT ABUSED ITS DISCRETION IN ALLOWING THE JURY TO VIEW A 31 MINUTE VIDEOTAPE OF THE CRIME SCENE WHICH DEPICTED THE VICTIMS IN A GRUESOME AND SHOCKING WAY.
XII. THE SENTENCE IMPOSED ON THE DEFENDANT WAS EXCESSIVE UNDER THE CIRCUMSTANCES.
We reject defendant's arguments addressed to the conduct of the trial and affirm his convictions. However, we conclude that the trial court erred in failing to merge defendant's convictions for second degree aggravated assault with his convictions for attempted murder. We also conclude that the court erred in imposing a 20 year term of imprisonment, with ten years of parole ineligibility, on defendant's convictions for attempted murder, which was a second degree offense when these offenses were committed. Therefore, we modify defendant's sentence so as to impose an aggregate term of life imprisonment *392 plus 20 years imprisonment, with 40 years of parole ineligibility.
The only arguments made by defendant which require discussion are Points I, III, IV, VI and XII. Defendant's other points are clearly without merit. See R. 2:11-3(e)(2).

I
Defendant argues that the trial court improperly excluded his proposed expert testimony regarding the mental diseases of personality disorder and depression.
N.J.S.A. 2C:4-2 provides in pertinent part that:
Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense.... Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.
In State v. Breakiron, 210 N.J. Super. 442, 449, 510 A.2d 80 (App.Div. 1986), a majority of this court held that evidence of a mental disease or defect is only admissible under N.J.S.A. 2C:4-2 if the trial judge is "persuaded by a preponderance of the evidence that the defendant suffered from a `mental disease or defect which would negate a state of mind which is an element of the offense.'" However, the Supreme Court reversed this holding in State v. Breakiron, 108 N.J. 591, 532 A.2d 199 (1987), concluding that a defendant does not have to persuade the trial judge by a preponderance of the evidence that a mental disease or condition exists. Rather, for evidence of a mental disease or defect to be admissible, a defendant only need make a preliminary showing that "(1) that the condition he purports to establish is relevant to his ability to have formed the requisite criminal mental state; (2) that the medical theory underlying the effect of the condition upon the relevant mental state is generally accepted within the scientific community; and (3) that the evidence defendant plans to adduce is relevant to show the existence of the condition." Id. at 619, 532 A.2d 199.
*393 Defendant's trial was held subsequent to the issuance of our opinion in Breakiron on May 22, 1986, but before the issuance of the Supreme Court's opinion on October 29, 1987. Consequently, the trial court applied a "preponderance of the evidence" standard in deciding whether defendant's evidence of the mental diseases of personality disorder and depression was admissible. Although the application of this standard was error, we conclude that this error was harmless because the evidence of the mental diseases of personality disorder and depression proffered by defendant would not have been admissible even under the standards of admissibility set forth in the Supreme Court's opinion in Breakiron.
Defendant offered testimony by two experts, Dr. David Bogacki, a clinical psychologist, and Dr. Kenneth Weiss, a psychiatrist, in support of his diminished capacity defense.
At a Rule 8 hearing regarding the admissibility of evidence of mental disease, Dr. Bogacki testified that defendant suffers from a depressive disorder, a personality disorder and polysubstance abuse. He further testified that "the combination of depression and polysubstance abuse" made it "very likely" that defendant would "act out his emotions physically." Moreover, "he was likely to behave in ways that would reflect paranoia and also would likely to be able to compromise his reality testing ability, and also lead [to] a transient psychotic episode where his judgment would be seriously compromised." However, on cross-examination Dr. Bogacki stated that he had not reached any conclusions regarding defendant's state of mind on March 7, 1985. In fact, in response to a question from the court as to whether defendant's mental disease existed on the day of the crime, Dr. Bogacki said:
It's very difficult for me to answer that, and I don't know whether  without some serious reflection on my part, whether I should answer it.
... I was never asked to formulate an opinion on that until this moment, and my own subjective feelings are if I knew I was going to be asked that question, perhaps, I would have tried to obtain data which was more pertinent to being able to answer that question specifically, such as some of the other records that were mentioned, such as more pointed questions asked of Mr. Russo about the *394 particular hour, moment, day that all this occurred, and obviously, I testified that this isn't the case.
At the Rule 8 hearing, the proposed testimony of Dr. Weiss was presented to the court by admitting into evidence by stipulation two reports he prepared before the trial. Dr. Weiss's first report expressed the opinion that:
[A]t the time of the incident, Mr. Russo was suffering from mental disease which, with respect to the shootings, rendered him incapable of performing knowing and purposeful behavior. The mental diseases in question were 1) multiple substance intoxications, including influences of alcohol, cocaine and heroin; and 2) depression. A predisposing factor in this mental state was Mr. Russo's extreme state of agitation due to both severe marital distress and the anniversary date of his father's death. My examination has made it quite clear to me that such behavior was entirely out of character for Mr. Russo, strongly indicating a deranged mental state. I therefore support the use of a psychiatric defense to negate criminal responsibility.
Dr. Weiss explained these opinions in further detail in his second report, as follows:
[T]he determinants of Mr. Russo's derangement were manifold, and most likely included influences of genetics, early development, traumatic emotional separations, extreme turmoil upon marital separation, unresolved grief for his father, extreme hostility toward his father-in-law, serious mental depression, and multiple substance abuse and intoxications.
* * * * * * * *
David Russo committed the crimes on March 7, 1985 in a state of mind reflecting mental disease and which represented a distinct departure from his ordinary behavior and judgment. I believe that he was potentially violent toward his father-in-law at the time he left Delaware on his way to New York.... It is entirely possible that he had stopped at the service station as an unwitting way to short circuit the killing of his father-in-law in New York. It is my opinion that in a fragmented and extremely emotionally aroused state his anger resurfaced, this time in a way that became directed toward the individuals in the service station. I do not believe that he was capable of forming the specific intent to commit these crimes. I believe that they were spontaneous and fragmented pieces of behavior tinged with outrage and hostility, but which bore no relationship in reality to his true intentions. It is for this reason that I would support the notion that his mental state negated the elements of knowing and purposeful behavior at that time.
Based on this evidence, the trial court concluded that "[t]he statements by the doctors do not indicate that the defendant had any of the features of either a manic episode or major depressive episode ... at the time of the [crime]" and that *395 "defendant does not meet the diagnostic criteria ... for antisocial personality disorder." Therefore, while the trial court expressed its decision in terms of a failure of proof of relevant mental disease by a preponderance of the evidence, the actual thrust of its opinion was that defendant had not proffered any evidence at all of the kind of depression or personality disorder which could negate the mental state required for a conviction of the offenses with which he was charged. We agree with this conclusion.
In Breakiron the Supreme Court stated that in order to qualify as evidence of a "mental disease or defect" within the intent of N.J.S.A. 2C:4-2, "at a minimum the evidence must be shown to be able `to negate a mental element of the crime charged,' or to otherwise impair cognition." Id. at 619, 532 A.2d 199 (citations omitted). Therefore, "[n]ot every mental disease or defect has relevance to the mental states prescribed by the Code.... Some, such as depression or anti-social disorders, have little or no relevance to knowledge." Id. at 618 n. 10, 532 A.2d 199.
Thus, the Court concluded in State v. Pitts, 116 N.J. 580, 607-610, 562 A.2d 1320 (1989) that the psychiatric testimony presented by defendant was not of a character which required the court to submit a diminished capacity instruction to the jury. The Court noted that:
[Defendant's psychiatrist] did not testify that defendant's state of mind when he stabbed the victims was caused by his mental disorders; rather, he based his opinion on what defendant had told him about the homicides and on the physical evidence, as well as on his testing of defendant. Nor did [defendant's psychiatrist] testify that defendant's particular mental disorders were generally acknowledged among psychiatrists to be capable of affecting one's ability to possess the state of mind required by the Code for murder. [Id. at 609-610, 562 A.2d 1320].
The evidence proffered by defendant of the mental disease of depression and personality disorder suffers from deficiencies similar to the evidence which the Court found inadequate in Pitts. Dr. Bogacki declined to express any opinion at all as to defendant's state of mind on the day of the crime. And while *396 Dr. Weiss's first report stated that one of the mental diseases from which defendant was suffering was "depression," his second report stated that at the time of the crime defendant was "in a fragmented and extremely emotionally aroused state of anger." Moreover, Dr. Weiss did not express an opinion that defendant was suffering from a personality disorder. Most significantly, neither Dr. Bogacki nor Dr. Weiss testified that depression or personality disorder "were generally acknowledged among psychiatrists to be capable of affecting one's ability to possess the state of mind required by the Code for murder," Id. at 610, 562 A.2d 1320, or any of the other offenses of which defendant was convicted. Additionally, the Supreme Court expressly stated in Breakiron that the mental diseases which defendant contends were erroneously excluded from consideration by the jury, "depression" and "anti-social disorders," "have little or no relevance to knowledge." 108 N.J. at 618 n. 10, 532 A.2d 199; see also State v. Carroll, 242 N.J. Super. 549, 557-558, 577 A.2d 862 (App.Div. 1990). Consequently, we conclude that the evidence of "depressive disorder" and "depression" proffered by defendant did not purport to establish his inability to have formed the mental state required for the offenses of which he was convicted and therefore its exclusion was consistent with the Supreme Court's opinion in Breakiron.

II
Defendant contends that the trial court's instruction regarding intoxication was misleading because it indicated that the jury had to conclude that defendant acted knowingly or purposely before it could consider the defense of intoxication.
It is of course fundamental that "[a]ccurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial." State v. Concepcion, 111 N.J. 373, 379, 545 A.2d 119 (1988). Consequently, a trial court must give the jury "a comprehensible explanation of the question that [it] must determine, including the law of the case *397 applicable to the facts that the jury may find." State v. Green, 86 N.J. 281, 287-288, 430 A.2d 914 (1981). However, this does not mean that any misstatement of law during the course of jury instructions automatically requires the reversal of a criminal conviction. "[P]ortions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973).
The portion of the jury instructions which defendant contends constituted reversible error reads as follows:
However, should you find that the State has proven beyond a reasonable doubt that all of the elements of the offense and that the defendant did not suffer from a mental disease or defect and you find that he acted knowingly or purposely, then you must find the defendant guilty and then you must consider the defense of intoxication. You are to consider the defense of intoxication only if you find that the defendant acted in a knowing or purposeful manner. With an intoxication defense you may find or consider that the defendant acted in a reckless manner. And I defined reckless for you previously.
All right, I will explain to you now the intoxication defense. You must remember that you're to consider this defense only if you find the defendant acted knowingly or purposely. Now this is the intoxication defense which comes into play if you find the defendant acted knowingly or purposely.
Considered in isolation, this portion of the trial court's instructions was quite misleading because it indicated that the jury should only consider the defense of intoxication after it had already determined that defendant had acted knowingly and purposely when he committed the offenses, rather than considering evidence of intoxication as part of the overall mosaic of evidence relevant to whether defendant had the mental state required to be found guilty. However, we conclude that this erroneous impression was corrected by the remainder of the court's instructions.
Immediately after the portion of the jury instructions relied upon by defendant, the court gave the following detailed instruction as to the role of evidence of intoxication in the jury's determination of whether defendant acted knowingly or purposely:

*398 There is evidence in this case concerning the use by the defendant of drugs, alcohol, heroin, cocaine and alcohol prior to and on the day in question, March 7, 1985. Generally, a defendant is not relieved of criminal responsibility because he is found to have acted under the influence of an intoxicating beverage or drugs. The general assumption is, every man is normal and when I say man, I mean lady too. So I say that by way of explanation. The general assumption is that every man is normal and is possessed of ordinary faculties. The State need not prove that the defendant was sober when you consider intoxication. The State doesn't have to prove he was sober because there's a general assumption that everyone is possessed of ordinary faculties.
You may consider the evidence as to defendant's consumption of alcoholic beverages or drugs in determining whether he was intoxicated to such a degree that he was incapable of acting purposely or knowingly. So his intoxication has to be to that degree where he couldn't, he didn't operate knowingly or purposely.
Therefore, once a defendant produces some evidence of his intoxication, the State must prove beyond a reasonable doubt that such intoxication did not render the defendant incapable of acting purposely or knowingly.
Intoxication under our law means a disturbance of mental or physical capacities resulting in the introduction of substances into the body. That's a legal definition of intoxication.
In considering the question of intoxication, you should carefully distinguish between the condition of the mind which is merely excited by intoxicating drugs or drink and yet capable of acting with purpose or knowledge, and the condition in which one's mental faculties are so overcome or prostrated so as to deprive him of his will to act and ability to reason, therefore rendering a person incapable of acting and thus preventing him from committing the crime charged with the mental state required of either purposely or knowingly.
This distinction is important because, as explained, whether or not the defense of intoxication applies is a fact question for you to decide. That is a factual determination to be made by you. All of the facts you determine. That is totally within your province.

You may also consider, with all the other evidence, the degree of intoxication in determining that he was intoxicated, whether or not the defendant was able to act purposely or knowingly to commit the crime charged against him. So, you make that determination. Is there intoxication? To what degree did it overcome? Did it overcome any purpose or emergency [sic], which the defendant must have. I have already defined purposely and knowingly to you.

If you should find that the State has failed to prove to you beyond a reasonable doubt that the defendant's intoxication prevented him [sic] from acting knowingly or purposely, then you must find the defendant not guilty of the charges requiring that he acted knowingly or purposely. [Emphasis added].
We are satisfied that this portion of the court's instructions accurately described the defense of intoxication and corrected *399 any misimpression the court may have conveyed by its introduction to this portion of the instructions.
We also note that the court gave similar instructions regarding the defense of intoxication as applied to various other offenses with which defendant was charged. For example, the court stated with respect to the charge of attempted murder:
I have already instructed you that a person is guilty of murder if he purposely or knowingly kills another person. And causing death or serious bodily injury must be within the design of the defendant.
You must consider the defendant's mental disease or defect of polysubstance abuse if it has been established. The state must prove beyond a reasonable doubt that the defendant did not suffer from mental disease or defect that prevented him from acting purposely or knowingly in attempting to kill or inflict serious bodily injury upon Dino Rossi or Ann Kiley. If you are not so convinced, this element has not been proved.
You must consider further the defendant's intoxication. The state must prove beyond a reasonable doubt that the defendant's intoxication did not prevent him from acting purposely or knowingly in attempting to kill or inflict serious bodily injury upon Ann Kiley or Dino Rossi in order to convict him. If you are not so convinced, that element has not been proven.
As to the charge of robbery, the court stated:
If you find beyond a reasonable doubt that the defendant committed the crime of robbery and he did not have the mental disease, the mental defect that prevented him from acting knowingly or purposely, that his intoxication did not prevent him from acting knowingly or purposely and that in the course of the robbery attempted to kill Dino Rossi and Joseph Iovanisci, he attempted to inflict serious bodily injury upon them, you should find him guilty of robbery in the first degree.
Similarly, with respect to the charge of felony murder, the court stated:
Now, if the State has proved to your satisfaction beyond a reasonable doubt that the defendant purposely committed a robbery; that the defendant did not have a mental disease or defect that prevented him from purposely committing the robbery; that the defendant's intoxication did not prevent him from purposely committing the robbery; that the defendant caused the death of Joseph Iovanisci; that Joseph Iovanisci's death was caused while the defendant was engaged in the course of and in committing the robbery; that Joseph Iovanisci was not a participant in the crime of robbery, then you should find the defendant guilty of felony murder.
We recognize that, near the end of its instructions, the court repeated the same misleading statement with which it had introduced its discussion of intoxication, as follows:

*400 Should you find that the state has proven beyond a reasonable doubt all the elements of the offense and that the defendant did not suffer from a mental disease or defect and you find that he acted knowingly or purposely, then you must find him guilty of that offense and then you consider the defense of intoxication, whether the defense of intoxication exists and only if you find that the defendant acted in a knowing and purposeful manner and in a reckless manner.
However, the court then again immediately reiterated the role of evidence of intoxication in the jury's determination of whether defendant had the requisite state of mind in order to be found guilty of the offenses with which he was charged.
Consequently, while the court's instructions with respect to the defense of intoxication were not a paragon of clarity, we are satisfied that as a whole they adequately conveyed to the jury that evidence of defendant's intoxication on the day of the offenses was to be considered together with all the other evidence, including evidence of his diminished capacity from polysubstance abuse, in determining whether he acted purposely or knowingly.

III
The leading case dealing with a defendant's right of self-representation is Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In Faretta the Court held that the right to self-representation is "necessarily implied by the structure of the [Sixth] Amendment." Id. at 819, 95 S.Ct. at 2533. The Court further held that this is not dependent upon a defendant's showing of his ability to defend himself. Id. at 836, 95 S.Ct. at 2541. Rather, the sole prerequisite of a defendant's right of self-representation is a showing that he has "knowing and intelligently" waived his right to counsel. Id. at 835, 95 S.Ct. at 2541. The Court stated:
It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in *401 some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."
When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits.... Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." [Id. at 834-835, 95 S.Ct. at 2540-41; citations and footnotes omitted].
See also McKaskle v. Wiggins, 465 U.S. 168, 173, 104 S.Ct. 944, 948, 79 L.Ed.2d 122 (1984) ("[A]n accused has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol").
The trial court concluded that although defendant's waiver of counsel was "knowing," it was not "competent and intelligent." State v. Russo, 219 N.J. Super. 189, 197, 530 A.2d 46 (Law Div. 1986). The court also concluded that "defendant does not comprehend the magnitude and complexities of the charges and of the entire proceedings, and that he does not possess the requisite competence and capacity to prepare and conduct a proper defense to the allegations as set forth in the indictment." Ibid. Accordingly, the court denied defendant's motion to proceed pro se.
Insofar as the trial court's opinion suggests that a defendant may be deprived of the right of self-representation based on the complexity of the proceedings or the magnitude of the consequences of a conviction in a capital case, see id. at 193-197, 530 A.2d 46, its analysis appears inconsistent with the sweeping and absolute language of Faretta. The Court in Faretta expressly *402 recognized that a defendant who represents himself ordinarily will be at a disadvantage compared to a defendant who is represented by counsel. However, it indicated that a defendant's ability to represent himself is irrelevant:
We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of his right to defend himself. [Id. 422 U.S. at 836, 95 S.Ct. at 2541].
We further note that lower federal courts and courts in other jurisdictions have held that the right of self-representation extends to capital cases. See, e.g., Diaz v. State, 513 So.2d 1045, 1047 (Fla. 1987) (capital murder defendant was properly allowed to proceed pro se where he competently, knowingly and voluntarily waived his right to counsel); accord, Townes v. Commonwealth of Virginia, 234 Va. 307, 362 S.E.2d 650, 655-657 (1987); Goode v. Wainwright, 704 F.2d 593, 598-599 (11th Cir.1983); Ex Parte Ford, 515 So.2d 48, 50 (Ala. 1987); People v. Joseph, 34 Cal.3d 936, 196 Cal. Rptr. 339, 671 P.2d 843 (1983). In People v. Joseph, the Supreme Court of California stated:
The only determination a trial court must make when presented with a timely Faretta motion is "`whether the defendant has the mental capacity to waive his Constitutional right to counsel with a realization of the probable risks and consequences of his action.' It is not, however, essential that defendant be competent to serve as counsel in a criminal proceeding; `his technical knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself.' [Faretta v. California, supra, 422 U.S. at 836, 95 S.Ct. at 2541]" One need not pass a "mini-bar examination" in order to exhibit the requisite capacity to make a valid Faretta waiver.
This court has held that once "a motion to proceed pro se is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be." These procedures apply equally to the guilt phase of a capital case. [195 Cal. Rptr. at 343, 671 P.2d at 847; citations omitted].
We agree with this analysis. Therefore, defendant would have been entitled to represent himself if he had waived his right to counsel "knowingly and intelligently."
*403 However, there is adequate support in the record for the trial court's finding that defendant's purported waiver of his right to counsel was not made "intelligently." First, we note that, as discussed in section I of this opinion, defendant's essential defense was psychological. Defendant's experts had submitted reports indicating that he suffered from a depressive disorder, a personality disorder and polysubstance abuse. A court must be especially cautious in finding any waiver of the right to counsel by a person allegedly suffering from a mental disease or defect. See State v. Shank, 410 So.2d 232 (La. 1982) (In situation where record reflects defendant wanted to be convicted of murder and sentenced to death, that he was 19, had only completed school through the 8th grade and had a history of mental illness, it was error to permit the defendant to conduct his own defense); cf. Ex Parte Ford, supra (Based on testimony of two expert witnesses, a psychologist and a psychiatrist, the trial court and Court of Criminal Appeals did not err in ruling that defendant was competent to waive his right to counsel in a capital case); see also State v. Kordower, 229 N.J. Super. 566, 572-581, 552 A.2d 218 (App.Div. 1989); State v. Guerin, 208 N.J. Super. 527, 506 A.2d 743 (App.Div. 1986); 2 LaFave and Israel, Criminal Procedure, § 11.5 at 48-49 (1984).
A review of the record in this case supports the trial court's finding that "defendant [did] not comprehend the magnitude and complexities of the charge and of the entire proceedings," State v. Russo, supra, 219 N.J. Super. at 197, 530 A.2d 46, and that his waiver of counsel was therefore not "intelligent." The most pertinent colloquy between the court and defendant regarding defendant's waiver of his right to counsel reads as follows:
THE COURT: [T]his is a capital case. You are aware of that?
MR. RUSSO: Very much so, Your Honor.
THE COURT: Yes, okay, and are you familiar with the procedure, procedure employed in a capital case, the guilt phase, the punishment phase?
MR. RUSSO: Yes, Your Honor.

*404 THE COURT: All right. Do you feel that at this point, if for some reason you did not have counsel either retained or appointed, do you feel that you would be able to properly  and by properly I guess we'll have to get into that, you would be able to properly defend yourself, represent yourself?
MR. RUSSO: I don't believe I can answer that question, Your Honor. I've never been placed in the position to do so to defend myself.
I would certainly say at this time that I would give it my best shot, but again, I've never purported to be a lawyer, a paralegal or anything, but your question is difficult to answer.
* * * * * * * *
THE COURT: ... [D]o you feel  I know you said you would give it your best shot, but tell me, do you feel that you could act as your own counsel through the entire proceeding or proceedings, through the jury selection process, the guilt phase, if it goes to that, and beyond that to the penalty phase, openings and closings? Do you feel that you could properly handle that, defend yourself in that regard?
MR. RUSSO: I will certainly try, Your Honor. If I can get the proper materials to do so, yes.
THE COURT: Are you familiar with the rules of evidence and procedure?
MR. RUSSO: Your Honor, again, as I invoke Faretta, Faretta specifically states I do not need to know anything about the law in order to represent myself.
So, your question then, I will have to say no, I do not know the rules of evidence so to speak.
THE COURT: All right. No, I said are you familiar with them?
MR. RUSSO: The rules of evidence, Your Honor?
THE COURT: Yes.
MR. RUSSO: No, I'm not.
THE COURT: The rules of evidence or the rules of procedure?
MR. RUSSO: No, I'm not, Your Honor.
THE COURT: All right. I think mention has been made that experts will be involved by both the prosecution and the defense. Have you  well, strike that.
Do you feel that you are familiar with the examination, cross-examination of witnesses sufficiently to present your case, not only regular witnesses, and I say regular, because they are not expert, regular and expert witnesses?
MR. RUSSO: I'll certainly have to learn rather quickly, Your Honor.
We do not discern in these comments a sufficient understanding by defendant of the nature of the charges against him, his available defenses or the procedures to be followed at trial, to be able to disagree with the trial court's finding that defendant's waiver of counsel was "not a competent and intelligent waiver." State v. Russo, supra, 219 N.J. Super. at 197, 530 *405 A.2d 46. Moreover, the complexity of the proceedings together with defendant's psychiatric problems provided ample support for the trial court's evident doubt whether defendant would be "able and willing to abide by rules of procedure and courtroom protocol." McKaskle v. Wiggins, supra, 465 U.S. at 173, 104 S.Ct. at 948. Consequently, we reject defendant's argument that he was denied his constitutional right of self-representation.

IV
Defendant contends that the prosecutor committed various improprieties before and during the trial which deprived him of a fair trial and therefore require a new trial. Although we agree that the prosecutor committed certain improprieties, the prosecutor's conduct was not so egregious that it deprived defendant of a fair trial.
It is fundamental that "[t]he primary duty of a prosecutor is not to obtain convictions, but to see that justice is done." State v. Ramseur, 106 N.J. 123, 320, 524 A.2d 188 (1987). "Thus, `[i]t is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'" Ibid., quoting State v. Farrell, 61 N.J. 99, 105, 293 A.2d 176 (1972). But when reviewing allegations of prosecutorial misconduct, our courts also are "mindful that criminal trials create a `charged atmosphere ... [that] frequently makes it arduous for the prosecuting attorney to stay within the orbit of strict propriety.'" State v. Ramseur, supra, 106 N.J. at 320, 524 A.2d 188, quoting State v. Bucanis, 26 N.J. 45, 56, 138 A.2d 739 (1958), cert. den. 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958). And even where a prosecutor has been guilty of misconduct, that "is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial." State v. Ramseur, supra, 106 N.J. at 322, 524 A.2d 188.
*406 Defendant contends that the prosecutor improperly instructed Dr. Speth, the county medical examiner, not to reveal certain inculpatory evidence during his direct examination, knowing that the defense would question the doctor on it during cross-examination. Specifically, defendant complains that although he was provided prior to trial with Dr. Speth's detailed medical examiner's report which contained no express opinions or conclusions as to the position of Iovanisci at the time he was shot, defendant was not advised that Dr. Speth had subsequently formed the opinion that "the victim was shot at close range while he was lying on the ground, that he got up and then was shot again."
Defendant moved to depose Dr. Speth prior to trial, expressing concern that Dr. Speth would not stay within the "four corners" of his autopsy report. The trial court denied defendant's motion, indicating that Dr. Speth's report would govern the scope of his trial testimony.
However, at trial the court permitted Dr. Speth to testify that Iovanisci moved between the first and second time he was shot and that he was on his knees and leaning somewhat forward between the two shots. On cross-examination, Speth clarified that Iovanisci had assumed a kneeling position sometime after the first shot. On recross examination, defense counsel asked if it was more likely that Iovanisci was in this upright position before the first shot was fired. Speth said that it was not more likely and proceeded to elaborate on his theory as to Iovanisci's position when he was shot. Speth stated that the blood flow patterns indicated that Iovanisci received the first shot while in a location at or close to the floor near Kiley's left armpit, that he then rose, crossed over the top of Kiley as she lay prone to his right and got into an upright position before he was shot a second time.
After the State rested, defendant moved for a mistrial based on Speth's testimony, claiming prosecutorial misconduct and violation of the rules of discovery. Dr. Speth was asked to give *407 testimony outside the presence of the jury in order to enable the court to rule on the motion. The doctor admitted that his autopsy report did not include any conclusion regarding bloodstain analysis. Although Speth could tell from these stains that Iovanisci was upright from the knees up, initially he could not determine the precise position Iovanisci was in either time he was shot. However, Speth reviewed the photographs of the crime scene over the weekend before trial in order to look at the blood patterns on the floor and also talked to certain law enforcement and medical personnel who had been on the scene the night of the crime. It was at that point that Speth formulated his additional opinions. Speth claimed that he told the assistant prosecutor of his new opinions but that the prosecutor told him that they did not differ from what the witnesses had already stated and what had already been presented in court. Speth said the prosecutor also told him that since the conclusions he had reached were based on evidence not produced in discovery and, in any event, did not change anything, the prosecution would proceed without presenting them. Speth claimed that the question defense counsel asked him during recross examination (i.e., whether Iovanisci was in an upright position before the first shot had been fired) was entirely different from the question the prosecutor had instructed him not to answer (i.e., whether Iovanisci was on his belly, his back, or squatting on his hands and knees when he was shot).
The trial court denied defendant's motion for mistrial, concluding that the prosecutor had not violated any of the rules governing discovery. We disagree.
A prosecutor is required to provide the defendant with a copy of the report of an expert witness, or if no report is prepared, a statement of the facts and opinions to which the expert is expected to testify and a summary of the basis of each opinion. R. 3:13-3(a)(11). Moreover, the prosecutor's obligation to provide such discovery is a continuing one. R. 3:13-3(f).
*408 We conclude that a prosecutor's obligations to disclose the opinions to which an expert is expected to testify extends not only to those opinions which will be elicited on direct examination but also any additional opinions which the prosecutor should reasonably expect will be brought out on cross-examination. And given the fact that defendant had attempted to depose Dr. Speth regarding any opinion he might have regarding Iovanisci's position when defendant fired the gun, the prosecutor should have anticipated that defense counsel might explore this subject on cross-examination. Therefore, the prosecutor should have disclosed all of Dr. Speth's opinions regarding this subject, including those reached during the weekend before trial.
However, the prosecutor's failure to provide this discovery did not deny defendant a fair trial. Defendant's only defense was that he lacked the requisite state of mind to be guilty of knowing or purposeful murder. The position of the deceased when defendant shot him had limited, if any, relevance to this contention. Furthermore, Dr. Speth's testimony that the decedent was lying on the floor when he was found shot was merely corroborative of Rossi's and Kiley's testimony. Therefore, even if defendant were surprised by Dr. Speth's testimony, it could not have had any significant prejudicial impact upon his defense. See State v. LaBrutto, 114 N.J. 187, 205, 553 A.2d 335 (1989).
Defendant also contends that it was improper for the prosecutor to refer to his wife, who testified on his behalf, as a "bitch," and to refer to his psychiatric experts as "whores." Our courts have strongly disapproved of the prosecutor's use of such language. See, e.g., State v. Williams, 113 N.J. 393, 456, 550 A.2d 1172 (1988) ("we caution prosecuting attorneys that derogatory name-calling will not be condoned."). But while these remarks were demeaning to the judicial process, we are convinced that they were not unduly prejudicial to *409 defendant and hence are not grounds for reversing his conviction.
Additionally, defendant claims the prosecutor erred when he accused defendant's wife of crying on the witness stand right before she was seen laughing in the hallway, implying that her tears were part of an act. When defendant's wife denied laughing in the hallway, the prosecutor claimed in front of the jury that people from his office had been watching her and that it was a "fact" she had been crying one minute and giggling the next. Again, she denied having giggled in the hallway and the matter was dropped.
We agree with defendant that the prosecutor's comments amounted to his giving testimony before the jury and that if the prosecutor had witnesses who could have rebutted the denial by defendant's wife that she laughed in the hallway, he should have called them to testify. Once again, however, we cannot say that the error, when viewed in the context of this two-month trial, was of such magnitude as to warrant a reversal.
Defendant's remaining claims of prosecutorial misconduct are clearly without merit. R. 2:11-3(e)(2).

V
The trial court sentenced defendant to a term of life, with 30 years of parole ineligibility, for the murder of Iovanisci and to consecutive terms of 20 years imprisonment, with ten years of parole ineligibility, for the attempted murder of Kiley, ten years of imprisonment, with five years of parole ineligibility, for the aggravated assault upon Kiley, and ten years imprisonment, with five years parole ineligibility, for the armed robbery of Iovanisci and Rossi. The sentences for the other convictions were made concurrent. Thus, the aggregate term of imprisonment imposed upon defendant was life plus 40 years, with 50 years of parole ineligibility.
*410 Under a single point heading asserting that his sentence is excessive, defendant argues that (1) the sentence for attempted murder was illegal; (2) his convictions for the aggravated assaults upon Kiley and Rossi should have merged with the convictions for the attempted murders of the same victims; (3) his conviction for armed robbery should have merged with his conviction for felony murder; (4) his conviction for possession of a handgun for an unlawful purpose should have merged with any of the other remaining convictions, i.e., robbery, aggravated assault, attempted murder, or murder; (5) the imposition of four consecutive sentences violated the guidelines for imposing consecutive sentences set forth in State v. Yarbough, 100 N.J. 627, 643-644, 498 A.2d 1239 (1985), cert. den. 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986); and (6) the court improperly identified and weighed aggravating and mitigating sentencing factors and hence imposed an excessive sentence. We will consider each of these arguments separately.
The State concedes that the 20 year terms of imprisonment, with ten years of parole ineligibility, imposed upon defendant for the attempted murders of Kiley and Rossi were illegal because attempted murder was only a second degree offense in 1985 when these offenses were committed. See L. 1986, c. 190, effective December 17, 1986, upgrading attempted murder to an offense of the first degree. Consequently, we reduce the sentences imposed upon defendant for the attempted murders of Kiley and Rossi from 20 years imprisonment, with ten years of parole ineligibility, to ten years, with five years of parole ineligibility.
We also agree with defendant's argument that his convictions for the aggravated assaults upon Kiley and Rossi should have merged with his convictions for the attempted murder of these same victims. Convictions merge if one offense is "included" in the other. N.J.S.A. 2C:1-8a(1). An offense is so included when, among other things, it differs from the offense charged only in the respect that a less serious *411 injury or risk of injury to the same person, or a lesser kind of culpability, suffices to establish its commission. N.J.S.A. 2C:1-8d(3). Attempted murder consists of an attempt to cause the death of another. See State v. Gilliam, 224 N.J. Super. 759, 763-764, 541 A.2d 309 (App.Div. 1988). Second degree aggravated assault consists of attempting to cause serious bodily injury to another or actually causing such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life. Thus, second degree aggravated assault differs from second degree attempted murder in the respect that a less serious injury is intended to be inflicted upon the victim. Also, second degree aggravated assault may be committed recklessly while attempted murder requires a purposeful act. Hence, a lesser kind of culpability suffices to establish second degree aggravated assault than attempted murder. Consequently, we vacate defendant's convictions for the second degree aggravated assaults upon Rossi and Kiley because these convictions merge with his convictions for the attempted murder of the same victims. See State v. Gilliam, supra, 224 N.J. Super. at 764, 541 A.2d 309; State v. Connell, 208 N.J. Super. 688, 695, 506 A.2d 829 (App.Div. 1986).
However, we reject defendant's argument that his conviction for armed robbery should have merged with his conviction for felony murder. Because defendant was convicted not only of felony murder but also purposeful and knowing murder, the felony murder conviction was "surplusage" and thus the underlying felony of robbery was not required to be merged into it. State v. Stenson, 174 N.J. Super. 402, 406-407, 416 A.2d 944 (Law Div. 1980), aff'd o.b. 188 N.J. Super. 361, 457 A.2d 841 (App.Div. 1982), certif. den. 93 N.J. 268, 460 A.2d 671 (1983); see also State v. Arriagas, 198 N.J. Super. 575, 581, 487 A.2d 1290 (App.Div. 1985), aff'd sub nom. State v. Crisantos, 102 N.J. 265, 508 A.2d 167 (1986).
We also reject defendant's contention that his conviction for possession of a weapon for an unlawful purpose should *412 have merged with the convictions for any of the other offenses. Defendant's own testimony to the effect that he left Delaware with the weapon with the intent of confronting his father-in-law in New York provided a sufficient foundation for not merging this conviction. We further note that the sentence for this conviction was made concurrent with his other convictions.
Next we consider defendant's argument that the consecutive sentences imposed upon him violated the guidelines set forth in State v. Yarbough, supra. Those guidelines are that:
1. There can be no free crimes in a system for which the punishment shall fit the crime;
2. The reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
3. Some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
(a) the crimes and their objectives were predominately independent of each other;
(b) the crimes involved separate acts of violence or threats of violence;
(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
(d) any of the crimes involved multiple victims;
(e) the convictions for which the sentences are to be imposed are numerous;
4. There should be no double counting of aggravating factors.
5. Successive terms for the same offense should not ordinarily be equal to the punishment for the first offense, and
6. There should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms .. . that could be imposed for the two most serious offenses. Id. 100 N.J. at 646, 498 A.2d 1239.
The four consecutive sentences imposed by the trial court clearly exceeded the sum of the longest terms that could be imposed for the two most serious offenses of which he was convicted and thus violated Yarbough guideline six. However, we have concluded for reasons previously discussed that one of those sentences, for the aggravated assault upon Kiley, must be vacated, and that another, for the attempted murder of Kiley, must be reduced to ten years imprisonment, with five years of parole ineligibility. The consequence of these rulings is that defendant's aggregate sentence must be reduced from *413 life plus 40 years imprisonment, with 50 years of parole ineligibility, to life plus 20 years imprisonment, with 40 years parole ineligibility. As thus modified, defendant's sentence does not violate Yarbough guideline six. The two most serious offenses of which defendant was convicted were murder, for which the maximum sentence is life imprisonment, with 30 years parole ineligibility, and armed robbery, for which the maximum sentence is 20 years imprisonment, with ten years of parole ineligibility. Thus, the sum of the maximum terms for these two offenses is life plus 20 years, with 40 years parole ineligibility, which is the aggregate sentence imposed upon defendant as a result of the modifications in sentence mandated by this opinion.
We are also satisfied that the imposition of consecutive sentences was consistent with the other Yarbough sentencing criteria. Although defendant's offenses were committed so closely in time and place as to indicate a single period of aberrant behavior (guideline 3(c)), the trial court properly concluded that this circumstance was outweighed by the fact that the offenses involved multiple victims (guideline 3(d)) and separate acts of violence (guideline 3(b)). We further note that the Supreme Court has indicated that the murders of multiple victims represents an especially suitable circumstance for the imposition of consecutive sentences. In State v. Serrone, 95 N.J. 23, 468 A.2d 1050 (1983), the Court stated:
Murder is the most heinous and vile offense proscribed by our criminal laws. The Legislature has determined that the "societal interest in punishing the guilty is so strong" that the crime of murder has never been subject to a statute of limitations. State v. Zarinsky, 75 N.J. 101, 107 [380 A.2d 685] (1977). In dealing with this particularly egregious offense, great deference must be given to the legislative intent governing sentencing. The Legislature has not expressly or inferentially suggested an intent to reduce the punishments for those convicted of multiple murders. On the contrary, the Code's special and individualized treatment given to murder manifests the Legislature's intent that a defendant may be subject to a life term for every homicide of which he is found guilty. We are satisfied that the Legislature intended that a trial court was fully authorized to sentence a defendant who committed two murders to consecutive life sentences. [95 N.J. at 27-28, 468 A.2d 1050; footnote omitted].
*414 We believe that a similar approach to the imposition of consecutive sentences is warranted where a defendant has attempted to commit execution-style murders of three victims but two have survived.[2]
Finally, we reject defendant's argument that such an aggregate sentence is excessive. The trial court properly viewed the nature and circumstances of the offenses, N.J.S.A. 2C:44-1a(1), and, in connection with the armed robbery and attempted murders, the gravity and seriousness of the harm inflicted on the victims, N.J.S.A. 2C:44-1a(2), as the dominant sentencing factors in this case.
Accordingly, we vacate defendant's convictions on the two counts of aggravated assault on the grounds of merger and we reduce his sentence on the two counts of attempted murder to ten years of imprisonment, with five years of parole ineligibility. In all other respects, we affirm defendant's convictions and sentences. The trial court should enter an amended judgment of conviction reflecting the modifications in defendant's sentence mandated by this opinion.
NOTES
[1] The indictment resulting in defendant's conviction superseded a prior indictment which had been dismissed as a result of various defects in the petit and grand jury selection procedures in Gloucester County. See State v. Russo, 213 N.J. Super. 219, 516 A.2d 1161 (Law Div. 1986).
[2] We note that the trial court could have imposed three consecutive sentences for the murder and two attempted murders, which would have yielded the same aggregate sentence of life plus 20 years, with 40 years of parole ineligibility, as the modified sentence which defendant is now required to serve.