**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5154-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MARCUS K. PERKINS,

     Defendant-Appellant.

_____

Argued January 7, 2018 – Decided  January 25, 2019

Before Judges Sabatino and Sumners.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 06-08-2926.

Michael T. Denny, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michael T. Denny, of counsel and on the brief).

Jason Magid, Assistant Prosecutor, argued the cause for respondent (Mary Eva Colalillo, Camden County Prosecutor, attorney; Jason Magid, of counsel and on the brief).

PER CURIAM

This direct appeal from a criminal conviction stems from the prosecution of defendant Marcus Perkins for felony murder, murder, robbery, and various other crimes. The case was previously described briefly in our 2017 published opinion addressing procedural issues. See State v. Perkins, 449 N.J. Super. 309 (App. Div. 2017). That earlier appeal involved the trial court's denial of defendant's petition for post-conviction relief ("PCR") based on his former counsel's failure to file a timely direct appeal from his judgment of conviction. With the State's acquiescence, we reversed the PCR denial and granted defendant an opportunity to file as within time a direct appeal. Id. at 312-13. That anticipated direct appeal is now before us.

Defendant raises these two points in his brief on appeal:

> POINT I
>
> THE JUDGE ERRED IN GIVING COPIES TO THE JURY OF THE LISTENING AIDS OF DEFENDANT'S POLICE INTERROGATIONS DURING DELIBERATIONS, GIVING THE JURY LICENSE TO PURUSE [SIC] TESTIMONIAL NON-EVIDENTIARY MATERIAL AT THEIR LEISURE, OUTSIDE THE PRESENCE OF COUNSEL, AND WITHOUT THE SUPERVISION OF THE COURT.
>
> A. The listening aids are not exhibits received in evidence and should not have been given to the jury.

B. Allowing the jury to take the listening aids into the jury room violated Perkins' constitutional right to a fair trial.

POINT II

THE TRIAL COURT'S CHARGE ON FELONY MURDER WAS INCORRECT, AND ITS CHARGES ON MURDER, AGGRAVATED MANSLAUGHTER, RECKLESS MANSLAUGHTER, AND THE ATTENDANT THEORIES OF ACCOMPLICE AND VICARIOUS LIABILITY AS APPLIED TO THOSE CRIMES AS WELL AS FELONY MURDER AND ROBBERY WAS MANIFESTLY CONFUSING, AND IMPROPERLY INSTRUCTED THE JURY THAT IT COULD CONVICT PERKINS WITHOUT UNANIMITY AMONG COUNTS. (not raised below)

A. The court's instruction on felony murder was incorrect, and invited the jury to find Perkins guilty of that crime only if they first found him guilty of murder, aggravated manslaughter, or reckless manslaughter.

B. The augmented unanimity charge was confusing, and comingled the consideration of guilt on three separate counts with the three different theories of liability advanced by the State.

Having carefully considered these points, we affirm the judgment of conviction for the reasons we shall amplify in this opinion. In essence, although we agree with defendant that, preferably, (1) the "listening aid" transcripts of defendant's statements should not have been supplied to the deliberating jurors,

3

and (2) aspects of the jury charge could have been clearer, those shortcomings do not rise to a level "clearly capable of producing an unjust result."  R. 2:10-2.

I.

The State's proofs at trial, including testimony from eleven witnesses, established the following sequence of key events:

On Friday, December 2, 2005, around 11:00 a.m., Vincent Latta ("Vincent") was reported missing by his wife, April Latta ("April"),[1] who subsequently became the codefendant in this case.  Law enforcement personnel responded to the Lattas' home in the City of Camden.

Police Officer Gabriel Camacho of the City's police department testified that he spoke with April upon his arrival.  She told him Vincent had left around 8:45 a.m. that morning to cash a check, withdraw money from the bank, and pick up a breakfast sausage at a local supermarket.  According to Officer Camacho, April told him that, around 10:45 a.m., she had looked outside the window and saw the garage door open.

April showed Officer Camacho the garage.  The garage door was ajar, and there was a supermarket bag containing a breakfast sausage roll and a receipt

---

[1]  We shall use the Lattas' first names to distinguish them from each other.  We intend no disrespect in doing so.

showing the roll had been purchased that day at 9:26 a.m.  Officer Camacho noticed the garage had some items in disarray, particularly two refrigerators which were out of position.  He also noted droplets of blood on lawn tools, and marks of blood on the garage door and on the garage floor.

Between 4:15 and 4:30 p.m. that same day, police officers found Vincent's car parked at South 9th Street and Liberty Street in Camden.  Officers found the dead body of Vincent in the trunk of the car, along with a bloodstained rope.  Based on these discoveries, the investigation changed from a missing person's investigation to a homicide investigation.

The State's case at trial primarily rested on incriminating statements given by three persons: defendant, codefendant April, and defendant's girlfriend.  There was no physical evidence specifically linking defendant with the crime.

April's Narrative

April testified at trial as a State witness, pursuant to a plea agreement in which she pled guilty to first-degree aggravated manslaughter and first-degree robbery, exposing her to a maximum twenty-two-year sentence.  April testified that she and defendant planned to rob Vincent, specifically agreeing for defendant to be present in the garage when Vincent returned from his errands.  According to April, their plan was that defendant would knock Vincent out, take

his money, put Vincent in his car, and park it somewhere so when Vincent woke up he would be robbed, and "that was it." April did not acknowledge she was present when Vincent was killed.

The Girlfriend's Narrative

Defendant's girlfriend's testimony for the State described his movements on the day of Vincent's death. She also recounted that defendant told her on Saturday, December 3, 2005, about having robbed Vincent and about Vincent's death.

Impeachment

The defense tried to undermine the credibility of both April and defendant's girlfriend. As to April, the defense's cross-examination included questions about: her prior convictions for welfare fraud and petty larceny, her guilty plea to aggravated manslaughter and robbery predicated on testifying truthfully at defendant's trial, and a letter that April wrote to defendant on February 11, 2006, stating that she was the one who had killed Vincent. As to defendant's girlfriend, the defense's cross-examination included questions about: whether she knew defendant was cheating on her, letters she had written to defendant while he was in jail, and whether she thought she was a suspect.

Defendant gave two recorded statements[2] to the police during their investigation: the first on December 3, 2005, and the second on December 5, 2005. In his first statement, defendant denied being present when the victim was robbed and killed and denied taking part in the robbery. In his second statement, defendant admitted to taking part in a robbery of Vincent, but denied killing him, claiming that April had strangled Vincent to death without his assistance.

Defendant's First Recorded Statement

More specifically, in defendant's first recorded audio statement to police, he described the events as follows. Defendant met April and Vincent in the spring of 2004 when they moved into the same complex where defendant's mother resided. The Lattas thereafter moved to a house in Camden near defendant's residence. April's son and his girlfriend lived there as well.

Defendant purchased large amounts of crack cocaine for the Lattas. He became friends with Vincent. He also developed a sexual relationship with April.

---

[2] Defendant does not contest on appeal the police's compliance with <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), or the admission of the recorded statements.

According to defendant, April confided in him about how Vincent, as well as April's son, were controlling her and that she "wanted out." April told defendant she had removed cash from Vincent's account, and that Vincent physically abused her for doing so. She also claimed Vincent had accused her of trying to rob him. At one point, April reported Vincent's conduct to the police and obtained a restraining order. Vincent moved in temporarily with his daughter, but returned after a judge dismissed the restraining order.[3]

Defendant told the police he would go over to April's place for coffee, and his girlfriend would occasionally go there as well. Defendant kept clothes and other things in the attic space above the Lattas' garage, but he did not have a key.

According to defendant, about a month and a half before the victim's death, April approached him, at first "jokingly," about killing her husband. She asked defendant questions, put "extra stuff" in Vincent's insulin needle, and tried to make him overdose on drugs. Defendant told the police April wanted him to "do it," but he allegedly turned her down numerous times. April stepped up this pressure on defendant about a week before the victim's death. According to

---

[3] Because these details of the previous domestic violence allegations emerged at the public criminal jury trial, we have no need to omit them from the facts or to seal the appellate record.

defendant, she threatened to tell defendant's mother about his drug use and to tell defendant's wife, who lived in California, about his extramarital affairs.

On Thursday, the day before Vincent's death, April told defendant that Vincent would be carrying between $1,750 and $2,000, because he had withdrawn money from the bank for rent and other bills, as well as having received money from April's son's girlfriend for rent.

Defendant initially told the police that on Friday, the day of Vincent's death, he awoke between 9:00 and 9:30 a.m., and took his puppies for a walk around 9:30 a.m. Defendant's girlfriend was sleeping when he left the house. When he returned from walking the puppies, his girlfriend was gone.

Defendant stated he went to April's house around 10:33 a.m. April, her son's girlfriend, and defendant's girlfriend were at the home when he got there. While alone with April in the kitchen, April told defendant she was waiting for Vincent, who had gone to the bank and then to get a breakfast sausage.

Defendant then walked his girlfriend partway to her place of work. Defendant claimed he then took his puppies to get vaccinated. While returning, defendant saw police at April's home and talked to April's son's girlfriend about what was happening. Defendant left and went to babysit his nieces and nephews.

A-5154-16T1

That evening, defendant went to various places, "trying to get [his] thoughts together."

After allegedly wandering around all night, defendant ended up back at his girlfriend's house and then went over the April's house the morning of Saturday, December 3. Defendant spoke with April's son, who took him into the garage. According to defendant, the son stated that April had confessed that she had arranged for someone to kill Vincent. The son told him that Vincent's body was found in a trunk, and that he "might have been shot or strangled or something."

Defendant claimed he was angry at himself because he could have prevented Vincent's death if he had reported April's plans. He maintained in his first police statement that he was not there when Vincent was killed, and only knew of possible individuals who could have done it. He also claimed April did not ask him to rob Vincent.

Defendant's Second Recorded Statement

In defendant's second audio-recorded statement to the police, he substantially revised his narrative. This time, defendant admitted that he took part in robbing, but not killing, Vincent.

Defendant reiterated to the police that April had been joking about different ways of killing Vincent for a "couple of months." A month before Vincent's death, April obtained a restraining order, which kept Vincent away from the house, but a judge dismissed the order and he returned.

According to defendant's second police statement, he and another unidentified person were supposed to take the money from Vincent, but the other person backed out. Defendant said he thought this was his "way out" of robbing Vincent, but he claimed April was "relentless" in pursuing whatever she wanted. According to defendant, April threatened, among other things, to tell his mother about his drug use.

Defendant's second statement markedly differed from his first one in describing the events that occurred on the day of Vincent's death. As recounted by defendant in this revised narrative, April came to his residence on the morning of the killing, and told him Vincent had gone to the bank. Around 9:00 a.m., defendant went to the Lattas' house. He waited for Vincent outside the garage. When defendant heard the garage door open, a car pull in, and the garage door close, he went into the garage and startled Vincent. Vincent fell back into the refrigerator. As defendant tried to grab Vincent, Vincent turned to run, grabbed his chest, and fell head-first into the garage door.

Defendant could see some blood "squirting" from the area around Vincent's head and face when Vincent hit the door. While defendant was leaving the garage, April came out of the house. She asked what happened and if Vincent was dead. April stated Vincent "has to die," and she then went into the garage.

According to defendant, when he went back into the garage, he saw that April had a rope looped around Vincent's neck. He heard Vincent saying, "you're killing me." Defendant admitted he did not leave. He explained, "I guess it was still the fact of the money." Defendant claimed he "basically tuned out" but heard gurgling and a hissing sound, as when a last breath leaves a person's body. Defendant saw April take money from Vincent. Defendant helped her load Vincent's body in the trunk of the car, and parked the car on South 9th Street and Liberty Street.

Defendant admitted he had gloves on during the incident. He claimed he threw them away while he was walking back from dropping off the car.

Defendant then went looking for his girlfriend, who was at April's place. Once there, defendant asked April for juice in order to get a chance to confront her alone and see what had happened with the money. According to defendant,

April tried to give him $700 to obtain drugs. He did not take the money and left. He claimed he went on to do the things he normally would do that day.

Defendant stated that he thought his "days were numbered" when he saw the police, because he knew April would tell the police about him.

Defendant claimed he did not tell anyone else about the crime. His girlfriend asked him about it, and he responded he did not want to talk about it.

The Indictment, Trial, and The Jury Verdict

The indictment charged defendant and April with first-degree murder, N.J.S.A. 2C:11-3(a)(1), -3(a)(2) (count one); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); first-degree robbery, N.J.S.A. 2C:15-1 (count three); third-degree possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4(d) (count four); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count five); third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1) (count six); and conspiracy, N.J.S.A. 2C:5-2 (count seven).

The case was tried over six days in October 2008. Defendant did not testify, and he did not present any witnesses. As part of the State's proofs, the jury heard both of defendant's recorded statements to the police. They were

supplied to the jurors in the courtroom with transcripts of the recorded statements when those statements were played.

Following their deliberations, the jurors found defendant not guilty of first-degree murder on count one, but did find him guilty on that count of the lesser-included offense of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a). The jury also found defendant guilty on count two of first-degree felony murder. On count three, the jury found defendant guilty of robbery, although their verdict form reflects they found the State had <u>not</u> proven that during the course of the robbery defendant had been armed with, used, or threatened the immediate use of a deadly weapon.[4] The jury found defendant not guilty on count four, possession of a weapon for an unlawful purpose, but guilty on the remaining counts five, six and seven. On count seven, the jury clarified on the verdict form that its conspiracy finding was based on a conspiracy to commit robbery, rather than to commit murder or felony murder.

---

[4] Given the nature of the trial proofs and the structure of the verdict form, this specific finding on the form signifies that defendant was only found guilty of second-degree, not first-degree, robbery. The judgment of conviction, however, incorrectly reflects a disposition on this count as first-degree robbery. During oral argument on the appeal, the State agreed that the judgment of conviction should be amended on the robbery count to be consistent with the verdict. That change is of little practical consequence, since the robbery conviction merged at sentencing, and either first-degree or second-degree robbery can support a felony murder offense when, as here, the robbery victim is killed.

The trial court imposed upon defendant an aggregate sentence of thirty-nine years. For count two, felony murder, defendant was sentenced to serve a custodial term of thirty-five years, subject to the parole ineligibility terms of the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, with a five-year parole supervision period upon parole. For count five, unlawful possession of a weapon, defendant was sentenced to a custodial term of eighteen months, nine months to be served without parole, to run concurrent to count two. For count six, hindering apprehension or prosecution, defendant was sentenced to four years, twenty-four months without parole, to run consecutive to the sentences for count two and five. Counts one, three, and seven merged with count two for the purposes of sentencing.[5]

## II.

## A.

Defendant's first argument is that the trial court committed reversible error when it supplied the jurors, at their request and over his trial attorney's objection, with so-called "listening aids" in the jury room. The aids consisted of transcripts of the audiotapes of defendant's two statements to the police.

---

[5] Defendant does not challenge his sentence on appeal.

Defendant maintains it was unduly prejudicial to him for the jurors to have in their possession the two transcripts, which were not exhibits in evidence. He speculates the jurors' ready access to the transcripts might have caused them to afford too much weight to his self-incriminating statements. We are unpersuaded this requires reversal and a new trial.

We acknowledge Rule 1:8-8(a) states that the jury "may take into the jury room the exhibits received in evidence[.]" (Emphasis added). "[I]nadmissible materials submitted to the jury by the court may result in error." Pressler & Verniero, Current N.J. Court Rules, cmt. 1.1 on R. 1:8-8 (2019); see Dunn v. Praiss, 256 N.J. Super. 180, 199 (App. Div. 1992). However, our courts have recognized the provision of such non-admitted materials does not necessarily constitute error. Pressler & Verniero, cmt. 1.1 on R. 1:8-8 (citing State v. W.B., 205 N.J. 588, 622-23 (2011) (finding the playback, in open court, of a videotape not admitted into evidence did not constitute an abuse of discretion, and noting that defense counsel may have invited the error)); State v. Watson, 261 N.J. Super. 169, 181 (App. Div. 1992) (finding the presence of a dictionary in the jury room, which the judge removed once she became aware of it and instructed the jury not to refer to it but to rely instead on her charge, was incapable of producing an unjust result).

The admission of the non-evidential materials into the jury room in this case therefore is not automatic reversible error. We must instead consider whether the error was "clearly capable of producing an unjust result." R. 2:10-2.

It is significant that for many years before this case was tried in October 2008, case law permitted tape recordings of conversations, and transcripts of those conversations, to be supplied to jurors to listen to in the jury room during their deliberations. See State v. DeBellis, 174 N.J. Super. 195, 199-200 (App. Div. 1980) (noting that trial judges have the discretion to allow jurors to access such transcripts "as an aid for understanding a tape recording"). In June 2008, the Supreme Court in State v. Burr, 195 N.J. 119 (2008), changed the permissible procedures. To avoid the risk of undue prejudice, Burr now prescribes that any playback of videotaped out-of-court statements must occur in open court and not in the jury room. Id. at 134-35. Juries also cannot have unfettered access to audio-recorded statements. State v. A.R., 213 N.J. 542, 561 (2013) ("[U]nder no circumstances shall the jury have unfettered access to audio- or video-recorded statements in the jury room during deliberations.").

We do not fault the trial judge in this case for not adhering to the Supreme Court's very recent change of practice announced only a few months earlier in

17                                                                    A-5154-16T1

<u>Burr</u>.  There is no indication in the record that either trial attorney called the judge's attention to the recent <u>Burr</u> opinion.

Moreover, defendant's trial attorney did not oppose the jurors' use of the recordings in the jury room.  In fact, defense counsel in her closing argument urged the jurors to listen to certain parts of the recorded statements.  There is also no claim that the transcripts are inaccurate.

The judge issued a careful limiting instruction explaining to the jurors that the transcripts were not evidence, and that their own perceptions of the actual recording should control.  We presume that instruction was heeded.  <u>State v. Burns</u>, 192 N.J. 312, 335 (2007).

Given these circumstances, we detect no reversible error stemming from the trial court's decision to accede to the jurors' request and provide them with the listening aids.  The error was not clearly capable of producing an unjust result.

B.

The other issue raised by defendant concerns the wording of portions of the jury charge.  In particular, defendant points out the charge issued on felony murder contained a passage erroneously indicating that the jury would need to find him guilty of murder, aggravated manslaughter, or reckless manslaughter

(i.e., homicide offenses) in order to find him guilty of felony murder. Defendant further argues that the court provided erroneous and confusing instructions on accomplice and vicarious liability, both initially and later when the deliberating jurors requested clarification of those concepts.

None of these alleged errors in the jury instructions were objected to by defendant's trial counsel. Consequently, we consider these arguments under the "plain error" standard of appellate review. R. 2:10-2; see State v. Macon, 57 N.J. 325, 336 (1971).

To be sure, we recognize that "[a]ppropriate and proper charges to a jury are essential for a fair trial," State v. Green, 86 N.J. 281, 287 (1981), and that the trial court has an "independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case[.]" State v. Reddish, 181 N.J. 553, 613 (2004). Even so, we are unpersuaded that these unobjected-to flaws in the jury charges, identified for the first time in defendant's appellate brief, warrant reversal and a new trial.

The flaw in the charge concerning the elements of felony murder does not reflect material prejudice likely to have harmed defendant in the jury deliberations. If anything, the charge's mistaken statement that the jury would need to find defendant guilty of murder or manslaughter in order to find him

guilty of felony murder imposed, in effect, a greater burden on the prosecution. The crime of robbery alternatively can supply the predicate offense to support a felony murder conviction. N.J.S.A. 2C:11-3(a)(3); State v. Gonzalez, 318 N.J. Super. 527, 536 (App. Div. 1999).

The State's proofs strongly established that defendant took part in a robbery of the victim. Indeed, defendant's second statement to the police admitted as much. There also is considerable evidence, in addition to defendant's own words, that the victim died during the course of that robbery.

Despite the court's mistaken explanation, the verdict form question on count two (felony murder) clearly asked the jurors – not about a predicate offense of homicide – but whether defendant, acting either alone or with another person, caused the death of the victim while engaged in the commission or attempted commission, or flight from, the "crime of [r]obbery." The jury found defendant guilty of felony murder on this express basis and also found him guilty of robbery in count three.

It is sheer speculation to believe, as defendant now argues, that the jurors may have improperly found him guilty of aggravated manslaughter simply to support a felony murder conviction. Looking, as we must, at the charge and verdict form the judge reviewed with the jurors during the charge as a whole,

20

see State v. Simon, 161 N.J. 416, 477 (1999), there is no doubt that the jurors understood that robbery was the predicate offense upon which their verdict's felony murder conviction rested.

We likewise find no basis for relief in defendant's separate claim that the jury charges on vicarious liability and accomplice liability were confusing and must have produced an unsound verdict. Although we recognize the deliberating jurors submitted notes to the court expressing some confusion about these concepts, and were accordingly re-instructed, we do not regard the court's explanations of the concepts to be materially deficient. Defendant claims that the charges invited the jurors to rest their verdicts on non-unanimous grounds. We disagree.

The court ultimately explained the conceptual differences between liability for personal conduct, accomplice liability, and vicarious liability sufficiently, and emphasized that "all" of the jurors had to agree on which one of these three alternative theories, if any, supported defendant's guilt in order to convict him. Although perhaps portions of the charge could have been more clearly or consistently expressed, the flaws do not rise to reversible error.

A-5154-16T1

The balance of defendant's criticisms of the jury instructions, to the extent we have not already discussed them, lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION